VANOVERBEKE, MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD (P42641)
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Local Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re HOME POINT CAPITAL INC. SECURITIES LITIGATION | )<br>)<br>) | Civ. No. 2:21-cv-11457-LJM-KGA |
|  |  | Judge Laurie J. Michelson<br>Magistrate Judge Kimberly G. Altman |
|  |  | CLASS ACTION |
|  |  | AMENDED CLASS ACTION COMPLAINT |
|  |  | JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

**Page**

I.     NATURE OF THE ACTION.................................................................1

II.    JURISDICTION AND VENUE..................................................7

III.   PARTIES .................................................................8

IV.    DETAILED ALLEGATIONS .........................................12

      A.    Background.................................................12

      B.    Materially False and Misleading Statements Issued in the
           Offering Documents ...............................................15

      C.    The Truth Emerges ..................................................24

V.     CLASS ACTION ALLEGATIONS .............................................32

COUNT I (Violations of Section 11 of the Securities Act Against
      Home Point and the Individual Defendants)......................................34

COUNT II (Violations of Section 15 of the Securities Act Against the
      Individual Defendants and the Stone Point Defendants)...................37

PRAYER FOR RELIEF.................................................39

DEMAND FOR TRIAL BY JURY ...............................................39

Lead Plaintiff Abdulaziz Jamal Johar Al-Johar ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Home Point Capital Inc. ("Home Point" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action brought on behalf of all persons and entities other than Defendants that purchased or otherwise acquired Home Point common stock pursuant and/or traceable to the Company's January 29, 2021 initial public offering (the "IPO" or "Offering"), seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities

Act") (the "Class").  The claims in this action arise from Home Point's materially misleading Offering Documents (defined below) issued in connection with the IPO.

2.      Home Point is a residential mortgage originator and servicer.  The Company's origination segment sources loans through wholesale, correspondent, and direct channels, and the servicing segment collects loan payments and otherwise administers mortgage loans.

3.      The Company's primary business is originating mortgage loans through the wholesale channel, which involves making loans through independent brokers. Home Point has relationships with a network of independent mortgage brokerages, known as Broker Partners, who establish and maintain direct relationships with borrowers.  Once a potential borrower is identified by a Broker Partner, Home Point's role is to underwrite and make the loan.  Home Point then sells the loans it has made to investors, primarily Government-Sponsored Entities ("GSEs") such as Fannie Mae and Freddie Mac.

4.      Home Point's revenues primarily consist of the difference between the cost of originating mortgage loans in the wholesale channel and the price at which it is able to sell those loans to investors.  The margin that mortgage lenders like Home Point earn due to that difference is known as "gain-on-sale margin."

5.      In addition to its gain-on-sale margin, Home Point's profitability is also determined to a significant extent by its costs.  The Company's costs include

employee compensation and benefits, technology costs, servicing expenses, and administrative costs, among others.

6.     Home Point was founded in 2014, began operations in 2015, and has expanded quickly.  As of September 30, 2020, Home Point was the third largest wholesale lender in the United States by volume and held a 6.4% market share in the wholesale channel, an increase of approximately four times from its 1.6% market share in 2017.  Home Point has also aggressively expanded its network of Broker Partners, from 1,623 Broker Partners as of December 31, 2018, to nearly 5,000 by September 30, 2020, and over 6,000 by March 31, 2021.

7.     Home Point conducted an IPO on January 29, 2021, issuing 7.25 million shares of the Company's common stock to the public at the Offering price of $13.00 per share, for proceeds of $88,123,750 to the selling stockholders before expenses and after applicable underwriting discounts and commissions.  The IPO took place pursuant to a Form S-1 filed with the SEC on January 8, 2021 and amended on January 22, 2021 ("Registration Statement") and a prospectus on Form 424B4 filed with the SEC on February 1, 2021, which incorporated and formed part of the Registration Statement (the "Prospectus" and, together with the Registration Statement, the "Offering Documents").

8.     Home Point itself did not sell stock in the IPO.  Rather, Home Point stock was sold in the IPO by existing stockholders, including Defendant William A.

3

Newman, Home Point's Chief Executive Officer ("CEO") at the time of the IPO; other Home Point executives; and a group of funds (defined below as the "Trident Stockholders") managed by Defendant Stone Point Capital LLC, a private equity firm.

9.    The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

10.    Specifically, the Offering Documents represented that Home Point was "differentiated" from its competitors in the wholesale channel, in significant part because of its purportedly low-cost, highly efficient operations.  Home Point touted its "dedication to a highly scalable low-cost structure," which purportedly offered "improved financial flexibility in varying interest rate environments."  According to the Offering Documents, this aspect of Home Point's business model was integral to achieving "increased profitability" and "compet[ing] successfully across market cycles."

11.    The Offering Documents also highlighted, as a "Key Performance Indicator," the steep growth in Home Point's gain-on-sale margin in 2020, from 96.8 basis points for the nine months ending on September 30, 2019 to 253.1 basis points for the nine months ending on September 30, 2020 – a gain of 161.5%.  Home Point

4

further indicated that this increase was "primarily driven by the low interest rates market which resulted in increased demand."  While Home Point acknowledged in the Offering Documents that changes in interest rates <u>could</u> adversely affect its ongoing profitability, it did not disclose that this is what the Company <u>expected</u> to happen.  Home Point also touted a "tailwind" behind its origination business based on low interest rates that, according to Home Point, were "expected" to persist for years, without revealing that Home Point internally expected interest rates to rise and margins to decline.

12.     These statements in the Offering Documents, along with others detailed below, were false and misleading.  In fact, by growing quickly and expanding its network of Broker Partners, Home Point had effectively locked in increased expenses that it would not be able to reverse to a significant degree when market conditions deteriorated.  Further, as it later revealed but did not disclose in the Offering Documents, Home Point fully expected its gain-on-sale margins to collapse, which would severely undermine the Company's profitability.

13.     The truth was revealed on May 6, 2021, when Home Point issued a press release and held an earnings call announcing the Company's financial results for the first quarter of 2021.  Among other results, Home Point reported adjusted revenue of $324.2 million, missing consensus estimates by $41.72 million.  Home Point further revealed that its gain-on-sale margin had deteriorated, from 200 basis

points in the fourth quarter of 2020 to 128 basis points in the first quarter of 2021. For the wholesale channel in particular, Home Point revealed that its gain-on-sale margin had collapsed to approximately 78 basis points in April 2021, and that its wholesale lending business was unprofitable at those levels.

14.     In Home Point's May 6, 2021 earnings call, Defendant Mark Elbaum, the Company's Chief Financial Officer ("CFO"), made the remarkable admission that Home Point had "<u>frankly expected</u>"[1] that its gain-on-sale margin in the wholesale channel would decline significantly from the level it had reached at the time of the IPO.  Home Point had misleadingly failed to disclose that expectation in the Offering Documents, even when touting its then-impressive gain-on-sale margin and discussing the low interest rate environment that influenced that margin.

15.     Further, Home Point's cost structure, far from being "highly scalable" and "flexible" as described in the Offering Documents, was effectively locked in at growing levels, even in unfavorable market conditions.  In its May 6, 2021 earnings call, Home Point disclosed that its expenses had soared from $84 million in the first quarter of 2020 to $227 million in the first quarter of 2021, and had increased from the fourth quarter of 2020 to the first quarter of 2021 even as interest rates rose and margins declined.  As this disclosure revealed, the Offering Documents' description

---

[1]     Emphasis has been added throughout unless otherwise noted.

of Home Point's purportedly "highly leverageable cost structure [that] allows for improved financial flexibility in varying interest rate environments" was false and misleading.

16.     Because Home Point's costs were not "highly scalable" or "flexible" in varying market cycles as represented in the Offering Documents, the Company's expenses grew as market conditions worsened and gain-on-sale margins collapsed – a collapse that the Company had "expected" but not disclosed.  As a result, Home Point's financial condition deteriorated, as the Company revealed on May 6, 2021.

17.     On this news, Home Point's stock price fell 17.7%, or $1.66 per share, to close at $7.72 per share on May 6, 2021.

18.     At the time this suit was brought, Home Point's stock price continued to trade below the $13.00 per share Offering price, damaging investors.

19.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Home Point's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o).

21.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act (15 U.S.C. §77v), and this Court has personal jurisdiction over each of the Defendants.

22.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b). Home Point is headquartered in this judicial district, Defendants conduct business in this judicial district, and many of the acts and practices complained of herein took place in substantial part within this judicial district.

23.    In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.    PARTIES

24.    Plaintiff Abdulaziz Jamal Johar Al-Johar, as set forth in the Certification attached to his Motion for Appointment as Lead Plaintiff and filed on August 20, 2021 at ECF No. 14-3 (the "Certification"), acquired Home Point common stock at artificially inflated prices pursuant and/or traceable to the Offering Documents for the Company's IPO and was damaged thereby.    Additionally, Plaintiff received an assignment (also attached to his Motion for Appointment as Lead Plaintiff and filed on August 20, 2021 at ECF No. 14-5) from Al Johar Investment Company Ltd. ("Al Johar Inv. Co."), transferring all claims, demands,

and causes of action arising from violations of the federal securities laws of the United States of America in connection with its purchase of Home Point securities. As set forth in the Certification, Al Johar Inv. Co. also acquired Home Point common stock at artificially inflated prices pursuant and/or traceable to the Offering Documents for the Company's IPO and was damaged thereby. Plaintiff's and Al Johar Inv. Co.'s purchases of Home Point common stock took place on January 29, 2021, the date of the IPO, at the prices set forth in the Certification.

25.     Defendant Home Point is a Delaware corporation with principal executive offices located at 2211 Old Earhart Road, Suite 250, Ann Arbor, Michigan 48105. The Company's securities trade in an efficient market on the Nasdaq Global Select market ("NASDAQ") under the ticker symbol "HMPT."

26.     Defendant William A. Newman ("Newman") was at the time of the IPO Home Point's President and CEO, and a Director of the Company. Newman signed Home Point's January 8, 2021 Registration Statement and its January 22, 2021 amended Registration Statement. Newman sold 56,377 shares of Home Point common stock in the IPO.

27.     Defendant Mark E. Elbaum ("Elbaum") was at the time of the IPO Home Point's CFO. Elbaum signed Home Point's January 8, 2021 Registration Statement and its January 22, 2021 amended Registration Statement.

28.     Defendant Andrew J. Bon Salle ("Bon Salle") was Chairperson of the Company's Board of Directors at the time of the IPO.  Bon Salle signed Home Point's January 22, 2021 amended Registration Statement.

29.     Defendants Agha S. Khan ("Khan"), Stephen A. Levey ("Levey"), and Eric L. Rosenzweig ("Rosenzweig") were Directors of the Company at the time of the IPO.  Khan, Levey, and Rosenzweig signed Home Point's January 8, 2021 Registration Statement and its January 22, 2021 amended Registration Statement. At the time of the IPO, Khan was a Senior Principal of Stone Point (defined below), Levey was a Principal and Counsel of Stone Point, and Rosenzweig was a Principal of Stone Point.

30.     Defendants Laurie S. Goodman ("Goodman") and Timothy R. Morse ("Morse") were identified as Director Nominees of the Company in the Offering Documents.  Goodman and Morse were elected to the Company's Board of Directors upon or before the consummation of the IPO.

31.     Defendants Newman, Elbaum, Bon Salle, Khan, Levey, Rosenzweig, Goodman, and Morse are sometimes referred to herein collectively as the "Individual Defendants."

32.     As directors and executive officers of the Company, the Individual Defendants were responsible for implementing Home Point's IPO and promoting the IPO to investors.

10

33.     Defendant Stone Point Capital LLC ("Stone Point") is a private equity firm.  Its headquarters is located at 20 Horseneck Lane, 1st Floor, Greenwich, CT 06830.  Stone Point is identified in the Offering Documents as Home Point's "Sponsor."  Stone Point managed each of the Trident Stockholders (defined below), which owned a majority of the voting power of Home Point's common stock at the time of the IPO, and which continued to do so after the IPO.  The Offering Documents identify Home Point as a "controlled company" because, "[a]fter the completion of this offering, our Sponsor [*i.e.*, Stone Point] will continue to beneficially own shares representing more than 50% of the voting power of our shares eligible to vote in the election of directors."  The Offering Documents further explain that Stone Point controlled the election and removal of Home Point's directors and "thereby determine[d] [the Company's] corporate and management policies" and "business operations and strategy," including with respect to "costs and expenses," among other matters.  Further, the Offering Documents make clear that, as long as Stone Point "continues to own a significant amount" of voting power, even if such amount is less than 50%, Stone Point "will continue to be able to strongly influence or effectively control [the Company's] decisions[.]"

34.     Defendants Trident VI, L.P., Trident VI Parallel Fund, L.P., Trident VI DE Parallel Fund, L.P. and Trident VI Professionals Fund, L.P. (collectively, the "Trident Stockholders") are private equity funds managed by Stone Point.  At the

time of the IPO, the Trident Stockholders owned a majority of the voting power of Home Point's common stock. Even after they sold 7,047,181 shares of Home Point common stock in the IPO, the Trident Stockholders owned approximately 92% of the voting power of the Company. Stone Point and the Trident Stockholders are sometimes referred to herein as the "Stone Point Defendants."

## IV.   DETAILED ALLEGATIONS

### A.   Background

35.   Home Point, together with its subsidiaries, operates as a residential mortgage originator and servicer. In its origination segment, Home Point sources loans through wholesale, correspondent, and direct channels. In the wholesale channel, the Company makes mortgage loans to borrowers who have relationships with independent brokers; in the correspondent channel, the Company purchases loans from the original lenders; and in the direct channel, the Company engages directly with borrowers.

36.   When Home Point makes mortgage loans through these channels, it frequently retains mortgage servicing rights ("MSRs"). In its servicing segment, Home Point collects loan payments; remits principal and interest payments to investors; manages escrow funds for the payment of mortgage-related expenses, such as taxes and insurance; performs loss mitigation activities on behalf of investors; and otherwise administers mortgage loans.

37.     The largest and most significant part of Home Point's business is mortgage loan origination through the wholesale channel.  Home Point has described its wholesale lending business as its "primary focus."  For the last twelve months ending on September 30, 2020, $28 billion (or 61%) of the Company's total funded mortgage loan volume of $46 billion derived from the wholesale channel.

38.     To carry out its wholesale lending operation, Home Point has established relationships with a network of independent mortgage brokerages, known as Broker Partners, who have direct relationships with borrowers.  Once a potential borrower is identified by a Broker Partner, Home Point's role is to underwrite and make the loan.  Home Point then sells those loans to investors, primarily GSEs such as Fannie Mae and Freddie Mac.

39.     Home Point's revenues primarily consist of the difference between the cost of originating mortgage loans in the wholesale channel and the price at which it sells those loans to investors.  The margin that mortgage lenders like Home Point earn due to that difference is known as gain-on-sale margin.  Home Point's profitability is also significantly influenced by its costs, including employee compensation and benefits, technology costs, servicing expenses, and administrative costs, among others.

40.     Home Point was founded in 2014, began operations in 2015, and has expanded quickly.  As of September 30, 2020, Home Point was the third largest

wholesale lender in the United States by volume, and held a 6.4% market share in the wholesale channel, an increase of approximately four times from its 1.6% market share in 2017.

41.     From 2018 to 2020, Home Point undertook an aggressive expansion of its Broker Partner network, increasing the network from 1,623 Broker Partners as of December 31, 2018 to nearly 5,000 as of September 30, 2020, which represents an annualized growth rate of 88%.  Home Point's Broker Partner network further expanded to over 6,000 by March 31, 2021.

42.     Mortgage lenders, including Home Point, experienced strong profitability in 2020, driven in significant part by a high volume of mortgage refinancing activity prompted by low interest rates.

43.     Home Point took advantage of these market conditions by conducting an IPO in January 2021.  Maria Fregosi, Home Point's Chief Investment Officer, touted Home Point's growth and business prospects in a media interview, and added that the Company had determined that, "[g]iven the market conditions, it was a good point to go public and get the story out to the investor community."  As set out below, however, the "story" that Home Point told the investing public in the Offering Documents was materially false and misleading.

44.     On January 8, 2021, Home Point filed the Registration Statement with the SEC in connection with the IPO, which, after amendment on January 22, 2021, was declared effective on January 28, 2021.

45.     On January 29, 2021, Home Point conducted the IPO, issuing 7.25 million shares of the Company's common stock to the public at the Offering price of $13.00 per share for proceeds of $88,123,750 to the selling stockholders before expenses and after applicable underwriting discounts and commissions.

46.     On February 1, 2021, Home Point filed the Prospectus with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement, and together with the Registration Statement comprises the Offering Documents.

**B.    Materially False and Misleading Statements Issued in the Offering Documents**

47.     The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

48.     The Offering Documents represented to the investing public that Home Point was differentiated from its competitors in the wholesale lending business, in significant part because of its purportedly low-cost, flexible, and highly scalable

15

business model.  The benefit of this model, according to the Offering Documents, was that the Company would be able to scale its costs based on prevailing market conditions, including different interest rate environments, and thus maintain increased profitability across market cycles.

49.     These statements were materially false and misleading because the Offering Documents omitted the reality that by aggressively expanding its wholesale lending business, including its Broker Partner network, Home Point had effectively locked in higher costs that it would not be able to shed in significant part as interest rates rose and market conditions deteriorated for mortgage originators.

50.     The Offering Documents repeatedly emphasized the purported flexibility and competitive advantage offered by Home Point's cost structure, stating in relevant part:

> Our growth is bolstered by a rising tide from the overall wholesale channel, which has garnered an increased share of the overall U.S. residential mortgage market every year since 2016. **We benefit from these trends, as well as from our distinct wholesale strategy, which together enable** highly scalable production volumes, a strong mix of purchase transactions and *favorable unit economics, driven by lower fixed costs*.

*     *     *

> These efforts have resulted in rapid growth in our originations and profitability. **As we continue to grow, we believe the scalability of our partner-driven business model will produce significant operating leverage and increased profitability**.

*     *     *

16

We originate residential mortgages in our **Wholesale channel** through a nationwide network of nearly 5,000 mortgage brokerages. **We are strategically focused on this channel given that the underlying cost structure is more efficient than that of Distributed retail, where the costs and overhead associated with originating loans are the responsibility of the lender.** *As a result, we are able to operate with a lower fixed cost than many of our competitors. This <u>highly leverageable cost structure</u> allows for improved financial flexibility in varying interest rate environments.*

\*       \*       \*

**We have been able to achieve a competitive advantage in our sales cost structure through scale** as our sales associates are highly productive, averaging $36.3 million in monthly loan volume generation in 2020 to date for each associate with a tenure greater than six months. In addition, our distributed and flexible staffing model has allowed us to drive down per unit operating costs in our Wholesale channel from $2,085 per loan in 2018 to $1,700 per loan in the twelve months ended September 30, 2020, which represents a 18.5% improvement on an annualized basis and $629 per loan lower than the average of our competitors in the first half of 2020. Our cost per loan for the nine months ended September 30, 2020 was $1,680.

\*       \*       \*

The efficiency of our sales team, combined with our ***<u>flexible cost structure</u>***, has positioned us to further consolidate volume from the smaller and less efficient wholesale lenders that still control over 50% of the wholesale market.

\*       \*       \*

We have built a platform focused on serving third-party participants in the mortgage market. Our partner relationships and operating platform are intended to be reliable and scalable and to provide us **flexibility to respond to different market environments**. We believe that this provides us with significant operating leverage during market expansions **without requiring a high level of fixed overhead**.

\*       \*       \*

17

We were built to take advantage of the massive opportunity in the mortgage market over time through a **dedication to a _highly scalable low-cost structure_**, including in areas such as compliance, fraud prevention procedures and personnel training and retention, **which is capable of handling substantial increases in loan origination volume with minimal increases in expenses. We believe that our advantages will help us face substantial competition in this market**.

**We expect that our commitment to efficient operations,** a scalable origination platform supporting partner networks, and strategically utilized servicing capabilities **will allow us to compete successfully across market cycles. This has translated to our ability to achieve robust growth**. Since 2018, our funded volume has grown from $10.6 billion to $46.3 billion in twelve months ended September 30, 2020, representing a compounded annualized growth rate of 133%. Our funded volume for the nine months ended September 30, 2020 was $38.0 billion. Our profitability and capital efficiency has translated into net income for the nine months ended September 30, 2020 of $422.6 million and Adjusted Net Income for the nine months ended September 30, 2020 of $494.6 million.

\*     \*     \*

We believe our foundation of process engineering expertise and a componentized technology architecture has resulted in a competitive cost structure with significant upside opportunity. . . . We expect that the combination of superior process engineering and componentized technology will create a **best-in-class cost structure** and experience for our partners and customers.

51.     Further, the Offering Documents highlighted the Company's growth, including the rapid growth of its Broker Partner network, in the context of its purportedly flexible, low-cost business model, stating in relevant part:

Our Wholesale strategy further propels our growth, with total loan originations of $46.3 billion through our Broker Partner network in the twelve months ended September 30, 2020.  This represents an

annualized growth rate of 133% since 2018. Our total loan originations for the nine months ended September 30, 2020 were $38.0 billion.

\* \* \*

We have grown our Broker Partner network from 1,623 as of December 31, 2018 to nearly 5,000 as of September 30, 2020, which represents an annualized growth rate of 88%. As of September 30, 2020, we held a 6.4% market share in the wholesale channel according to *Inside Mortgage Finance*, which represents an approximately 4x increase from our market share of 1.6% in 2017. We expect to continue to grow our presence in the wholesale channel by expanding our Broker Partner network, as well as increasing the wallet share we have with our partners.

**The rate of growth in our Wholesale channel also demonstrates its scalability. We believe that our extensive network of in-market Broker Partners, a durable yet flexible operating infrastructure and *a highly leverageable cost structure* allow us to quickly flex origination capacity through different origination environments, while maximizing profitability.**

\* \* \*

We are the third largest wholesale lender according to *Inside Mortgage Finance* as of September 30, 2020. Our Broker Partner relationships have grown from 1,623 in 2018 to nearly 5,000 as of September 30, 2020. We expect this growth trend to continue going forward, as our Broker Partners constitute only 20% of the addressable market as of September 30, 2020. **Our scale, best-in-class in-market sales force and operational efficiencies are sustainable competitive advantages for our business.** We believe our competitive advantages, coupled with the significant opportunity to add new relationships, positions us as the most likely consolidator of market share from smaller competitors.

52.    The Offering Documents also touted rapid growth in the Company's gain-on-sale margins. In the section highlighting "Key Performance Indicators," the Offering Documents stated that Home Point's gain-on-sale margin for the nine

19

months ending September 30, 2020 was 253.1 basis points, compared to 96.8 basis points for the nine months ending September 30, 2019, 89.6 basis points for calendar year 2019, and 79.5 basis points for calendar year 2018.  The Offering Documents also linked Home Point's margin growth to the prevailing low interest rate environment, stating:

> **Gain on sale margin increased by 161.5% for the nine months ended September 30, 2020 compared to the nine months ended September 30, 2019. The increase of Gain on sale margin was primarily driven by the low interest rates market which resulted in increased demand.** This increase in demand led to increased margins for the nine months ended September 30, 2020 compared to the nine months ended September 30, 2019.

53.    The Offering Documents acknowledged that changes in interest rates "may" or "could" affect Home Point's margins and thus its profitability, but did not disclose that, in fact, the Company <u>expected</u> its gain-on-sale margins for its wholesale lending business to collapse.  In particular, the Offering Documents stated in the "Risk Factors" section of the Prospectus:

> **The gain recognized from sales in the secondary market represents a significant portion of our revenues and net earnings.** Further, we are dependent on the cash generated from such sales to fund our future loan closings and repay borrowings under our loan funding facilities. A decrease in the prices paid to us upon sale of our loans could materially adversely affect our business, financial condition and results of operations. **The prices we receive for our loans vary from time to time and <u>may</u> be materially adversely affected by several factors, including**, without limitation: . . . **the level and volatility of interest rates**[.]

*      *      *

**Interest rate fluctuations <u>could</u> significantly decrease our results of operations and cash flows and the fair value of our assets.** Interest rates are highly sensitive to many factors, including governmental monetary and tax policies, domestic and international economic and political considerations and other factors beyond our control. Due to the unprecedented events surrounding the COVID-19 pandemic along with the associated severe market dislocation, there is an increased degree of uncertainty and unpredictability concerning current interest rates, future interest rates and potential negative interest rates. Interest rate fluctuations present a variety of risks to our operations. Our primary interest rate exposures relate to the yield on our assets, their fair values and the financing cost of our debt, as well as to any derivative financial instruments that we utilize for hedging purposes. Decreasing interest rates may cause a large number of borrowers to refinance, which could result in the loss of future net servicing revenues with an associated write-down of the related MSRs. In addition, significant savings in interest rate movement may impact our gains and losses from interest rate hedging arrangements and result in our need to change our hedging strategy. Any such scenario could have a material adverse effect on our business, results of operations and financial condition.

**Changes in the level of interest rates also <u>may</u> affect** our ability to acquire assets (including the purchase or origination of mortgage loans), the value of our assets (including our pipeline of mortgage loan commitments and our portfolio of MSRs) and any related hedging instruments, the value of newly originated or purchased loans, and **our ability to realize gains from the disposition of assets**.

\*       \*       \*

**A downturn in economic conditions resulting in adverse changes in interest rates**, inflation, the debt capital markets, unemployment rates, consumer and commercial bankruptcy filings, the general strength of national and local economies and other factors that negatively impact household incomes <u>could</u> **decrease demand for our mortgage loan products as a result of a lower volume of housing purchases and reduced refinancings of mortgages and could lead to higher mortgage defaults and lower prices for our loans upon sale.**

54.     Rather than acknowledging that Home Point expected interest rates to rise and its gain-on-sale margins to fall, the Offering Documents touted a "tailwind" that was supposedly behind Home Point's origination business based on a statement that the Federal Reserve was expected to maintain interest rates at their then-current levels through 2023.  Specifically, the Offering Documents asserted in relevant part:

> **The current low interest rate environment provides a tailwind** to origination volumes through decreased borrowing costs. According to the Federal Reserve's September FOMC Statement, the Federal Reserve is **expected to maintain rates at their current levels through 2023**.

55.     The statements in the Offering Documents referenced above in ¶¶ 47-54 were materially false and misleading when made because they failed to disclose that: (i) by aggressively expanding its wholesale lending business, including its Broker Partner network, Home Point had effectively locked in higher costs that it would not be able to shed in significant part in worsening market conditions, including increased interest rates and decreased margins; (ii) Home Point actually expected reduced gain-on-sale margins and thus decreased profitability as a result of higher interest rates; (iii) accordingly, the Company had overstated its business and financial prospects; and (iv) as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

56.     Additionally, Defendants violated their affirmative obligations to provide certain material information in SEC filings as required by applicable SEC

rules and regulations.  Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required Defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   Item 303 continues: "If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed."

57.    In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of the IPO Registration Statement, a "discussion of the material factors that make an investment in the registrant or offering speculative or risky," and that each risk factor "adequately describe[] the risk," including by concisely explaining "how each risk affects the registrant or the securities being offered."

58.    Defendants' omissions described above in ¶¶ 47-55 violated Item 303 and Item 105.  Adverse factors concerning revenues, costs, and the relationship between them – namely, Home Point's lack of flexibility to cut costs significantly as the Company grew – were known to Defendants at the time of the IPO, as were adverse expectations concerning interest rates and gain-on-sale margins.  These were

some of the most significant factors impacting the risk profile of Home Point securities, and were likely to, and did, have a material adverse impact on Home Point's revenues and income from continuing operations.

### C. The Truth Emerges

59. On May 6, 2021, Home Point issued a press release announcing disappointing financial results for the first quarter of 2021. Among other results, Home Point reported adjusted quarterly revenue of $324.2 million, missing consensus estimates by $41.72 million.[2] This figure was significantly below the Company's adjusted revenue of $440.7 million for the fourth quarter of 2020. Home Point's total revenues also declined, from $453.9 million in the prior quarter to $422 million. In addition, Home Point reported that its net income had declined from $184.5 million in the prior quarter to $149 million, and that its adjusted net income had declined from $170.9 million in the prior quarter to $72.7 million. The adjusted net income figure of $72.7 million corresponds to earnings of $0.52 per share, which was well below consensus analyst estimates of $0.72 per share.

60. For Home Point's wholesale business in particular, the May 6, 2021 press release disclosed that the contribution margin (*i.e.*, revenue minus directly

---

[2] Adjusted revenue and adjusted net income figures remove any changes in the fair value of the Company's servicing portfolio.

attributable costs) for that segment had declined 38% from $302.3 million in the fourth quarter of 2020 to $188.8 million in the first quarter of 2021.

61.    Home Point's May 6, 2021 press release also revealed that the Company's gain-on-sale margin had deteriorated from 200 basis points in the fourth quarter of 2020 to 128 basis points in the first quarter of 2021.  Home Point's gain-on-sale margin for its wholesale segment in particular declined from 234 basis points to 152 basis points during that period.

62.    Home Point hosted an earnings call with investors and analysts on May 6, 2021 to discuss the Company's Q1 2021 results.  During the scripted portion of that call, Defendant Elbaum stated that, "in comparison to the fourth quarter of 2020, total revenue in the first quarter of 2021 declined by 7% **primarily due to a lower gain on sale margin**, which was partially offset by higher origination volumes and the fair market value increase in the MSR asset."

63.    On the May 6, 2021 earnings call, Elbaum also emphasized the importance of gain-on-sale margins, and stated that higher interest rates and competitive dynamics had contributed to Home Point's margin decline:

> We have consistently said, **our top priority for capital is, at this point, total gain on sale margin**, and the first quarter of 2021 increased 32% from the year ago quarter and decreased 36% from 200 basis points in the fourth quarter of 2020.  **Given the [interest] rate and competitive environment** [CEO] Willie [Newman] discussed, **in the first quarter of 2021, we generally saw margins decline across all channels**.

64.     Likewise, Elbaum noted on the May 6, 2021 earnings call: "I tend to focus on gain on sale margins in the wholesale channel because that's frankly 70%, 80% of our business[.]"   Analysts also focused on Home Point's gain-on-sale margins.   As one analyst with JMP Securities had noted on Home Point's fourth quarter 2020 earnings call on March 11, 2021, "investors are focused on margins" because "obviously the models are incredibly sensitive there."

65.     In light of the importance of Home Point's gain-on-sale margin to its profitability, investors and analysts who participated in the May 6, 2021 earnings call questioned Home Point executives about the sharp decline in that margin. Defendant Elbaum responded by revealing that Home Point's wholesale gain-on-sale margin had collapsed to approximately 78 basis points in April 2021, and that its wholesale segment was unprofitable at those levels.   In particular, Elbaum explained:

> While we expect continued strong volumes in the second quarter, the operating environment over the last few months has been challenging. As a result, **gain on sale margins particularly in the wholesale channel have been under significant pressure**. While we started to see some signs of that at the end of the first quarter, wholesale margins continue to trend lower as we enter the second quarter. ***In fact, for the month of April, we estimate total origination revenues in the wholesale channels were approximately 78 basis points which is essentially an operational breakeven level for us.*** Although we view the current market dynamics as temporary, we cannot predict when wholesale revenues will begin to improve. So we are planning to continue to operate in an environment where wholesale revenues are at the low end of historic norms, of approximately 115 basis points for the foreseeable future.

66.     This collapse in gain-on-sale margin was highly significant to Home Point's financial condition.  A UBS analyst, for example, downgraded Home Point's rating based on the "heavy" compression in the Company's wholesale gain-on-sale margin, and noted in the accompanying research report that this margin had declined in April 2021 to "a level we did not expect [Home Point] to reach."  Likewise, a Wells Fargo analyst indicated in an equity research report that he was "surprised" by the Company's April 2021 gain-on-sale margin figure, and that he believed this disclosure was "the main driver for the stock weakness."

67.     Remarkably, Elbaum further acknowledged in the May 6, 2021 earnings call that the decline in Home Point's gain-on-sale margin had been "<u>frankly</u> <u>expected</u>."  Specifically, he explained that the "<u>expected component</u>" of Home Point's margin decline, which constituted the majority of that decline, resulted from an excess of mortgage lending supply compared to demand, which had been undermined by rising interest rates.  Elbaum also noted that "competitive dynamics" further contributed to the decline in Home Point's gain-on-sale margin.  He stated:

> I think there's a couple of dynamics.  Number one is the dynamics that Willy [Newman] described in terms of this dislocation.  ***And I think clearly, we have higher pull through and higher capacity.  So there is more room in the funnel in terms of the supply/demand economic relationship.  But I think that's part of the pressure and that was frankly expected.***  I think the reason for the increased pressure is this competitive dynamics. So I would say some of that, but ***that would be the expected component, which is why we would go from, let's say, 158 basis points to, we would describe a more normalized level of 115.***

27

The reason we're below that now, I think, is unrelated, and I think it has to do with this unique competitive environment we're in.

68.    The Offering Documents misleadingly omitted Home Point's expectation that its gain-on-sale margins would collapse. Rather, Home Point revealed that expectation only <u>after</u> the collapse occurred. The statements in the Offering Documents concerning interest rates and gain-on-sale margins, which stated only that changes in interest rates "may" or "could" affect Home Point's margins, and which touted a "tailwind" behind Home Point's origination business based on low interest rates that were "expected" to persist for years, were thus misleading half-truths at best.

69.    The Offering Documents also misrepresented that Home Point was built to withstand challenging market conditions, such as rising interest rates and tightening margins. One of the major purported advantages of Home Point's business model, as described in the Offering Documents, was its "low-cost," "highly scalable" and "flexible" cost structure. According to the Offering Documents, this structure would allow the Company to scale its costs as needed to maintain increased profitability across market cycles.

70.    In its May 6, 2021 earnings call, however, Home Point effectively revealed that these statements about its cost structure had been false and misleading when made. In fact, Home Point's costs resulting from its aggressive growth were largely locked in, and the Company was not in a position to reduce its expenses to a

28

significant degree as market conditions deteriorated.  Defendant Elbaum disclosed on the May 6, 2021 call that the Company's "total expenses of $227 million for the first quarter of 2021 are up from $84 million in the year ago quarter which reflects the capacity we added to accommodate the tremendous growth we have generated over the last year."[3]  Further, Elbaum revealed that the Company's direct cost of origination in the wholesale channel had reached "$1,700 to $2,000" per loan, an increase from Home Point's costs of $1,680 per wholesale mortgage loan for the nine months ending on September 30, 2020.[4]

71.    Home Point also acknowledged in its May 6, 2021 press release that its expenses had risen by $4 million from the fourth quarter of 2020 to the first quarter of 2021.  In particular, Home Point disclosed that its compensation and benefits, loan expenses, loan servicing expenses, occupancy and equipment costs, and depreciation and amortization expenses all increased during that period.  Moreover, Home Point disclosed that its compensation and benefits expenses – the Company's largest expense category – had approximately tripled since the first quarter of 2020, from

---

[3]    This compares to the Company's total expenses of approximately $364 million for the nine months ending on September 30, 2020 – a rate averaging approximately $121 million per quarter – set out in the Offering Documents.

[4]    By contrast, United Wholesale Mortgage – the second largest mortgage lender and largest wholesale mortgage lender in the United States, and one of Home Point's primary competitors – disclosed that it had lower expenses of $1,473 per wholesale mortgage loan for all of 2020, and $1,662 for the first quarter of 2021.

$53 million to $153.6 million.  The press release also stated that Home Point's direct expenses for its origination segment increased by $4.2 million from the fourth quarter of 2020 to the first quarter of 2021, and had more than tripled since the first quarter of 2020.

72.     Analysts were keenly focused on Home Point's operating expenses, and as one analyst with Piper Sandler noted in an equity research report, the cost increase from the fourth quarter of 2020 to the first quarter of 2021 was "a focus" on the May 6, 2021 earnings call "given pressure on origination margins."  That analyst further explained in a follow-up report concerning the Company's first quarter 2021 financial results that, unless and until Home Point could achieve a "significant drop in expenses," Home Point's stock price would be "range-bound."  Likewise, an analyst with JMP Securities indicated in a review of Home Point's first quarter 2021 performance that the Company's "elevated levels" of operating expenses "may need to be rationalized in order to provide an adequate return to shareholders."[5]  A Wells Fargo analyst similarly observed in a research report that Home Point's operating

---

[5]     Additionally, a UBS analyst was not moved by the possibility that Home Point might succeed in cutting expenses at some point after the first quarter of 2021, stating in a research report that any cost-cutting by Home Point had become "a 'show-me' story and we have limited visibility into whether these efforts will suffice to protect earnings."

expense figures for the first quarter of 2021 were far above the levels Wells Fargo had estimated.

73.     In short, on May 6, 2021, Home Point revealed both that its wholesale gain-on-sale margins had collapsed, as it had expected but not disclosed, and that its business model did not in fact allow for scaling down expenses to a significant degree in challenging market conditions, but rather involved escalating, locked-in costs.   Because Home Point's cost structure did not have the flexibility and scalability touted in the Offering Documents, the Company lacked the ability to withstand declining margins without major damage to its profitability.

74.     On this news, Home Point's stock price fell 17.7%, or $1.66 per share, to close at $7.72 per share on May 6, 2021.  Home Point's stock price continued to fall over the subsequent days as analysts continued publishing reports concerning this news, closing at $6.60 per share on May 7, 2021 and $6.07 per share on May 10, 2021.

75.     At the time this suit was brought, Home Point's stock price continued to trade below the $13.00 per share Offering price, damaging investors.

76.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Home Point's securities, Plaintiff, Al Johar Inv. Co., and other Class members have suffered significant losses and damages.

## V.    CLASS ACTION ALLEGATIONS

77.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Home Point common stock in the IPO or purchased Home Point common stock thereafter in the stock market pursuant and/or traceable to the Company's Offering Documents issued in connection with the IPO and were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns, and any entity in which the officers and directors of the Company have or had a controlling interest.

78.    The members of the Class are so numerous that joinder of all members is impracticable.  Since the IPO, the Company's securities have actively traded on NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands, of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Home Point or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

79.     Plaintiff's claims, and the claims that have been assigned to him, are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

80.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

81.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

82.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the Securities Act was violated by Defendants as alleged herein;

(b)     Whether the Offering Documents omitted and/or misrepresented material facts;

(c)     Whether the Offering Documents' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether the prices of Home Point securities were artificially inflated; and

(e)     The extent of damage sustained by Class members and the appropriate measure of damages.

83.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
### (Violations of Section 11 of the Securities Act
### Against Home Point and the Individual Defendants)

84.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.  Plaintiff does not allege, and does not intend to allege, fraud, recklessness, or intentional misconduct, and any implication of fraud, recklessness, or intentional misconduct is expressly disclaimed.

34

85.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against Home Point and the Individual Defendants.

86.     Section 11 gives rise to liability as to certain categories of defendants if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading[.]" 15 U.S.C. §77k(a).

87.     Section 11 identifies the following categories of defendants, among others, as those who may be liable thereunder: (a) "every person who signed the registration statement"; (b) "every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted"; and (c) "every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner[.]" 15 U.S.C. §77k(a)(1)-(3).

88.     The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein pursuant to Item 303 and Item 105.

89.     Home Point is the registrant for the IPO.  The Defendants against whom this Count is brought were responsible for the contents and dissemination of the Offering Documents.

90.     As issuer of the shares, Home Point is strictly liable to Plaintiff, Al Johar Inv. Co., and the Class for the misstatements and omissions in the Offering Documents.

91.     The Defendants against whom this Count is brought had a duty to, but did not, make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Offering Documents were true and without omissions of any material facts, were not misleading, and stated all material facts required to be stated therein pursuant to Item 303 and Item 105.

92.     By reasons of the conduct herein alleged, each Defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

93.     Plaintiff and Al Johar Inv. Co. (whose claims have been assigned to Plaintiff as set forth above) acquired Home Point shares pursuant and/or traceable to the Offering Documents for the IPO.

94.     Plaintiff, Al Johar Inv. Co., and the Class have sustained damages.  The value of Home Point securities has declined substantially subsequent to and due to Defendants' violations.

95.     At the time of their purchases of Home Point shares, Plaintiff, Al Johar Inv. Co., and the other members of the Class were without knowledge of the facts alleged herein and could not have reasonably discovered those facts prior to the disclosures described herein.

96.     Less than one year elapsed between the time that the facts upon which this Count is based were discovered or reasonably could have discovered and the time that this action was commenced.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time this action was commenced.

## COUNT II
### (Violations of Section 15 of the Securities Act
### Against the Individual Defendants and the Stone Point Defendants)

97.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.  Plaintiff does not allege, and does not intend to allege, fraud, recklessness, or intentional misconduct, and any implication of fraud, recklessness, or intentional misconduct is expressly disclaimed.

98.     This Count is asserted against the Individual Defendants and the Stone Point Defendants based upon Section 15 of the Securities Act, 15 U.S.C. §77o.

99.     Section 15 gives rise to liability as to "[e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection

with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under" Section 11. 15 U.S.C. §77o(a).   Control persons under Section 15 are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable[.]"  *Id.*

100.   The Individual Defendants and the Stone Point Defendants, by virtue of their offices, directorship, stock ownership, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Home Point within the meaning of Section 15 of the Securities Act.  The Individual Defendants and the Stone Point Defendants had and exercised the power and influence to cause Home Point to engage in the acts described herein.  Additionally, the Stone Point Defendants exercised control over Individual Defendants Khan, Levey, and Rosenzweig, and through them Home Point, by employing those Individual Defendants, as set forth above.

101.   The Individual Defendants' positions, and the Stone Point Defendants' controlling stockholder status and employment of Individual Defendants Khan, Levey, and Rosenzweig, made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

38

102.   By virtue of the conduct alleged herein, the Individual Defendants and the Stone Point Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff, Al Johar Inv. Co., and the Class for damages suffered.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Abdulaziz Jamal Johar Al-Johar demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff, Al Johar Inv. Co., and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff, Al Johar Inv. Co., and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff Abdulaziz Jamal Johar Al-Johar hereby demands a trial by jury.

39

DATED:  November 9, 2021

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHAD JOHNSON
JONATHAN ZWEIG

JONATHAN ZWEIG

420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100
chadj@rgrdlaw.com
jzweig@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

VANOVERBEKE, MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD (P42641)
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

*Local Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I, Jonathan Zweig, hereby certify that on November 9, 2021, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.



*/s/ Jonathan Zweig*
JONATHAN ZWEIG