VANOVERBEKE, MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD (P42641)
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Local Counsel for Lead Plaintiff

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF MICHIGAN

# SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re HOME POINT CAPITAL INC. SECURITIES LITIGATION | ) ) ) ) | Civ. No. 4:21-cv-11457-SDK-KGA |

Judge Shalina D. Kumar
Magistrate Judge Kimberly G. Altman

CLASS ACTION

LEAD PLAINTIFF'S OPPOSITION
TO DEFENDANTS' MOTION TO
DISMISS THE AMENDED
COMPLAINT

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................1

STATEMENT OF FACTS .........................................................................3

    1.    Home Point's Business ..............................................................3

    2.    False and Misleading Statements in the Prospectus ...................4

    3.    The Truth Emerges.....................................................................7

    4.    Procedural Background..............................................................11

ARGUMENT ..........................................................................................11

    1.    Home Point's Statements Were False And Misleading............12

    2.    Home Point's Statements and Omissions Were Material.........15

        a.    Home Point's Statements Were Not Immaterial Puffery .................................................................16

        b.    Safe Harbor for Forward-Looking Statements Is Not Applicable.................................................18

        c.    Items 303 and 105 of Regulation S-K Further Support Materiality.........................................21

    3.    Affirmative Defense of Loss Causation Does Not Support Dismissal ...................................................22

    4.    Individual Defendants and Stone Point Defendants Are Subject to Control Person Liability .........................................25

CONCLUSION ......................................................................................25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................11, 12

*Azzolini v. Corts Trust II*,
  2005 WL 3448053
  (E.D. Tenn. Dec. 14, 2005)................................................................................23

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)................................................................................15

*Bondali v. YumA Brands, Inc.*,
  620 F. App'x 483 (6th Cir. 2015)........................................................14

*Carvelli v. Ocwen Fin. Corp.*,
  934 F.3d 1307 (11th Cir. 2019) ...........................................................18

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) .......................................................17, 18

*Gaynor v. Miller*,
  273 F.Supp.3d 848 (E.D. Tenn. 2017)................................................23

*Helwig v. Vencor, Inc.*,
  251 F.3d 540 (6th Cir. 2001) ......................................................*passim*

*In re Compuware Sec. Litig.*
  301 F.Supp.2d 672 (E.D. Mich. 2004) ........................................13, 14

*In re F & M Distribs. Inc. Sec. Litig.*,
  937 F.Supp. 647 (E.D. Mich. 1996) .....................................................21

*In re Ford Motor Co. Sec. Litig.*,
  381 F.3d 563 (6th Cir. 2004) .......................................................14, 16

*In re Gen. Elec. Co. Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012) .................................................18

*In re Huffy Corp. Sec. Litig.*,
   577 F. Supp. 2d 968 (S.D. Ohio 2008) ..................................................................13

*In re Lason, Inc. Sec. Litig.*,
   143 F. Supp. 2d 855 (E.D. Mich. 2001) ...............................................................19

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) ...............................................................................18

*In re QuantumScape Sec. Class Action Litig.*,
   2022 WL 137729
   (N.D. Cal. Jan. 14, 2022) ...............................................................................19, 20

*In re Regions Morgan Keegan Sec., Deriv., and ERISA Litig.*,
   2010 WL 5464792
   (W.D. Tenn. Dec. 30, 2010) .................................................................................22

*In re Sofamor Danek Grp, Inc.*,
   123 F.3d 394 (6th Cir. 1997) ...............................................................................16

*In re UICI Sec. Litig.*,
   2006 WL 7354417
   (N.D. Tex. Sept. 29, 2006)..............................................................................17, 20

*Ind. State Dist. Council of Laborers & Hod Carriers Pension &*
   *Welfare Fund v. Omnicare, Inc.*,
   583 F.3d 935 (6th Cir. 2009) ...............................................................................22

*J & R Mktg., SEP v. Gen. Motors Corp.*,
   549 F.3d 384 (6th Cir. 2008) ...............................................................................12

*La. Mun. Police Emps. Ret. Sys. v. KPMG LLP*,
   822 F.Supp.2d 711 (N.D. Ohio 2011) ..................................................................24

*La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*,
   2021 WL 4397946
   (S.D. Ohio Sept. 27, 2021)...........................................................................13, 15, 20

*Miller v. Champion Enters. Inc.*,
   346 F.3d 660 (6th Cir. 2003) ...............................................................................19

- iii -

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
   877 F.3d 687 (6th Cir. 2017) ................................................................22

*Pelletier v. Endo Int'l plc*,
   338 F.R.D. 446 (E.D. Pa. 2021)...........................................................25

*Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*,
   966 F.Supp.2d 525 (M.D.N.C. 2013) ...................................................19

*Schuh v. HCA Holdings, Inc.*,
   947 F.Supp.2d 882 (M.D. Tenn. 2013) .................................................21

*Sheet Metal Workers Local 19 Pension Fund v. ProAssurance Corp.*,
   2021 WL 5866731
   (N.D. Ala. Dec. 10, 2021)....................................................................17

*Starkman v. Marathon Oil Co.*,
   772 F.2d 231 (6th Cir. 1985) ...............................................................16

*Wallace v. Sys. & Comput. Tech. Corp.*,
   1996 WL 195382
   (E.D. Pa. Apr. 19, 1996) ......................................................................21

*Weiner v. Tivity Health, Inc.,*
   365 F.Supp.3d 900 (M.D. Tenn. 2019) ...........................................13, 14

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §77k..................................................................................................*passim*
   §77k(a) ...............................................................................................12
   §77l(b)................................................................................................22
   §77o..................................................................................................*passim*
   §77z-2(b)(2)(D)...................................................................................19
   §77z-2(c)(i)(A)(1) ...............................................................................18
   §78j(b)................................................................................................22

17 C.F.R.
   §229.105(a) .........................................................................................21
   §229.303(b)(2)(ii) ...............................................................................21

Private Securities Litigation Reform Act of 1995
Pub. L. No. 104-67, 109 Stat. 737 (1995) ...............................................16, 18, 19

## STATEMENT OF ISSUES PRESENTED

**Count 1: Section 11 of the Securities Act of 1933**

(a)     Can Defendants show that the Amended Complaint does not adequately allege that the offering documents for Home Point's initial public offering contained false or misleading statements or omissions, where the Amended Complaint alleges detailed facts showing that the offering documents misleadingly omitted what Home Point's CFO later acknowledged was the Company's expectation that interest rates would rise and its margins would collapse, and misleadingly described the Company's purported low-cost, flexible cost structure? Plaintiff respectfully submits that the Court should answer: No.

(b)     Can Defendants establish a lack of loss causation as an affirmative defense at the pleading stage by showing that loss causation is impossible on the face of the Amended Complaint, where the Amended Complaint alleges facts showing that Home Point's stock price declined significantly on the day the corrective disclosures were made and in the days immediately thereafter, and analysts attributed the decline to those very disclosures? Plaintiff respectfully submits that the Court should answer: No.

**Count 2: Section 15 of the Securities Act of 1933**

Can Defendants show that the Amended Complaint does not adequately allege control person liability under Section 15 of the Securities Act as to the Stone Point Defendants and Individual Defendants Newman, Elbaum, Bon Salle, Khan, Levey,

and Rosenzweig, where the Amended Complaint alleges facts showing that, by virtue of their offices, directorships, stock ownership, and specific acts, those Defendants controlled a primary violator of Section 11 within the meaning of Section 15? Plaintiff respectfully submits that the Court should answer: No.

## STATEMENT OF CONTROLLING AUTHORITY

Section 11 of the Securities Act: 15 U.S.C. § 77k

Section 15 of the Securities Act: 15 U.S.C. § 77o

Materiality and safe harbor: *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) (en banc), *abrogated in part on other grounds, Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)

Puffery: *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005)

Loss causation: *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935 (6th Cir. 2009)

## PRELIMINARY STATEMENT

This case presents straightforward violations of Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"). Home Point Capital Inc. ("Home Point" or the "Company"), a residential mortgage originator and servicer, conducted an IPO in January 2021 by means of a registration statement which contained a prospectus that made numerous false and misleading statements and omissions. These misstatements and omissions concern the Company's wholesale lending operation, by far its most significant line of business, and fall into two major categories.

First, Home Point touted its significant wholesale margins driven by low interest rates, and stated that changes in interest rates *could* adversely affect its profitability, without disclosing—as the Company later revealed—that an increase in interest rates and decline in margins is exactly what the Company had *expected* to happen.[1] When interest rates rose after the IPO, the Company's wholesale margins collapsed, as Home Point expected.

Second, Home Point reassured investors that it was "differentiated" from its competitors because its costs were low, flexible, and scalable, which purportedly offered "improved financial flexibility in varying interest rate environments." *Id.* In fact, due to the Company's rapid expansion, Home Point's cost structure was

---

[1] Defendants' Motion to Dismiss ("MTD"), Ex. 3, ECF 26-4 ("Prospectus"). All emphasis is added and internal citations omitted unless otherwise noted.

effectively locked in at growing levels, even as market conditions worsened due to rising interest rates.

Margins and costs are among the most material financial metrics for a mortgage originator like Home Point, as they are the primary factors that determine profitability. Home Point both misleadingly concealed its actual expectation that interest rates would rise and margins would fall, and falsely reassured investors that even in the event of such conditions, it had a flexible, low-cost model that would enable the Company to shed costs and maintain profitability across unfavorable market cycles. The truth was revealed on May 6, 2021, when Home Point announced that its margins had collapsed while its costs had soared. In response, market analysts expressed surprise, and the Company's stock price declined significantly.

Defendants respond by attempting to strip away the context of Home Point's statements and obscure the materially misleading picture that they painted for investors considering whether to invest in the IPO. For example, Defendants highlight Home Point's boilerplate risk disclosures, which could not meaningfully neutralize the Company's false and misleading messages to investors. Defendants place particular emphasis on disclosures regarding the possibility of increased competition, which do not remotely address the misleading statements at issue. Defendants also attempt to characterize some of Home Point's statements as forward-looking or puffery, while ignoring these statements' content about the then-

- 2 -

existing state of Home Point's business. Defendants have not shown, and cannot show, that Home Point's repeated statements about the two key inputs that determined its profitability—wholesale margins and costs—were meaningless to a reasonable investor deciding whether to invest in the IPO.

Defendants' arguments concerning loss causation fare no better, because under Section 11, plaintiffs do not have to plead loss causation. Rather, lack of loss causation is an affirmative defense that defendants may raise after discovery. In any event, there is a strong causal link between Home Point's false and misleading statements and the investor losses at issue. Lastly, control person liability under Section 15 flows from certain Defendants' control of Home Point. For all of these reasons, and as detailed below, the Motion to Dismiss should be denied.

## STATEMENT OF FACTS

### 1. Home Point's Business

Home Point is a residential mortgage originator and servicer, with a "primary focus" on wholesale mortgage loan origination. Amended Complaint, ECF 23 ("AC") ¶37. The wholesale mortgage loan business involves making loans to borrowers who have relationships with independent brokers (*i.e.* "Broker Partners"). AC ¶¶35, 38. After a Broker Partner identifies a borrower, Home Point underwrites and originates the loan, and then sells it to an investor such as Fannie Mae. AC ¶38. Home Point's revenues consist primarily of "gain-on-sale margin," which is the

difference between its cost to originate loans and the price at which it sells them. AC ¶39. Home Point's profits are also highly influenced by its costs, such as employee compensation, technology costs, servicing expenses, and administrative costs. *Id.*

Home Point began operations in 2015 and grew rapidly until, by 2020, it was the third largest wholesale mortgage lender in the United States. AC ¶40. Home Point has aggressively expanded its network of Broker Partners, from 1,623 Broker Partners at the end of 2018 to nearly 5,000 as of September 30, 2020. AC ¶41. Home Point was highly profitable in 2020, driven in large part by a high volume of mortgage refinancing prompted by low interest rates. AC ¶42.

### 2. False and Misleading Statements in the Prospectus

In January 2021, Home Point conducted an IPO in which 7.25 million shares of the Company's common stock were sold to investors by existing shareholders, including Defendant Newman, Home Point's CEO; other Company executives; and funds (the "Trident Stockholders") managed by Defendant Stone Point Capital LLC ("Stone Point"), at an offering price of $13.00 per share. AC ¶¶8, 45.

In the Prospectus issued in connection with the IPO, Home Point repeatedly emphasized its purportedly low-cost, flexible, and highly scalable model, which supposedly would allow the Company to scale its costs based on market conditions and the interest rate environment, and thus maintain increased profitability across market cycles. The Company highlighted this message at least ten times, including:

- 4 -

- "We were built to take advantage of the massive opportunity in the mortgage market over time through a *dedication to a highly scalable low-cost structure . . . which is capable of handling substantial increases in loan origination volume with minimal increases in expenses*. We believe that our advantages will help us face substantial competition in this market. We expect that our *commitment to efficient operations* [and other factors] will allow us to *compete successfully across market cycles. This has translated to our ability to achieve robust growth*." AC ¶50 (Prospectus at 20).

- "We are strategically focused on [the wholesale] channel given that the underlying cost structure is more efficient than that of Distributed retail . . . As a result, *we are able to operate with a lower fixed cost than many of our competitors. This highly leverageable cost structure allows for improved financial flexibility in varying interest rate environments.*" AC ¶50 (Prospectus at 5).

- "We benefit from . . . *our distinct wholesale strategy*, which . . . enable[s] . . . *favorable unit economics, driven by lower fixed costs*." AC ¶50 (Prospectus at 1).

- "We have been able to achieve a *competitive advantage in our sales cost structure* through scale[.]" AC ¶50 (Prospectus at 6).

- "*[O]ur flexible cost structure*, has positioned us to further consolidate volume from the smaller and less efficient wholesale lenders[.]" AC ¶50 (Prospectus at 7).

- "Our partner relationships and operating platform are intended to be reliable and scalable and to provide us *flexibility to respond to different market environments. We believe that this provides us with significant operating leverage during market expansions without requiring a high level of fixed overhead.*" AC ¶50 (Prospectus at 19).

- "We believe our foundation of process engineering expertise and a componentized technology architecture has resulted in a *competitive cost structure with significant upside opportunity*. . . . We expect that the combination of superior process engineering and componentized technology will create a *best-in-class cost structure* and experience for our partners and customers. AC ¶50 (Prospectus at 20).

- "As we continue to grow, we believe the *scalability of our partner-driven*

*business model* will produce significant operating leverage and increased profitability." AC ¶50 (Prospectus at 4).

- "The rate of growth in our Wholesale channel also demonstrates its scalability. We believe that our . . . ***highly leverageable cost structure allow[s] us to quickly flex origination capacity through different origination environments, while maximizing profitability.***" AC ¶51 (Prospectus at 3).

- "***[O]perational efficiencies are sustainable competitive advantages*** for our business." AC ¶51 (Prospectus at 19).

These statements were false and misleading. As the Company later revealed, by aggressively expanding its wholesale lending business, including its Broker Partner network, Home Point had locked in higher costs that it could not shed as interest rates rose and market conditions deteriorated.

The Prospectus also touted rapid growth in Home Point's gain-on-sale margins, which had grown from 96.8 to 253.1 basis points due to low interest rates. AC ¶ 52. Home Point stated that changes in interest rates "***may***" or "***could***" affect its margins and thus its profitability, but did not disclose until later the reality that the Company ***expected*** interest rates to rise and its margins to collapse. For example, the Prospectus stated:

- "The gain recognized from sales in the secondary market represents a significant portion of our revenues and net earnings. . . . The prices we receive for our loans vary from time to time and ***may*** be materially adversely affected by several factors, including . . . the level and volatility of interest rates[.]" AC ¶53 (Prospectus at 38).

- "Interest rate fluctuations ***could*** significantly decrease our results of operations and cash flows and the fair value of our assets. . . . Changes in the level of interest rates also ***may*** affect our ability to realize gains from the disposition of assets." AC ¶53 (Prospectus at 45).

- "A downturn in economic conditions resulting in adverse changes in interest rates . . . *could* decrease demand for our mortgage loan products as a result of a lower volume of housing purchases and reduced refinancings of mortgages and *could* lead to higher mortgage defaults and lower prices for our loans upon sale." AC ¶53 (Prospectus at 46).

Home Point also touted a "tailwind" behind its origination business, based on a statement that the Federal Reserve was "*expected* to maintain [interest] rates at their current levels through 2023." AC ¶54. Home Point misleadingly omitted, however, that it actually expected interest rates to rise and its margins to decline.

### 3.    The Truth Emerges

In a press release and earnings call on May 6, 2021, Home Point announced very unfavorable financial results for the first quarter of 2021. For example, the Company's adjusted quarterly revenue and earnings per share were far below analyst estimates. AC ¶59. Home Point's wholesale gain-on-sale margin declined from 234 to 152 basis points in the first quarter of 2021, and collapsed to 78 basis points in April 2021, rendering its wholesale lending business unprofitable. AC ¶¶60, 65.

This decline in wholesale gain-on-sale margin was highly significant. Defendant Mark Elbaum, Home Point's CFO, acknowledged that he "tend[s] to focus on gain on sale margins in the wholesale channel because that's frankly 70%, 80% of our business[.]" AC ¶64 (MTD Ex. 7 at 13). Likewise, a JMP Securities analyst noted that "investors are focused on margins" because "obviously the models are incredibly sensitive there." *Id.* (MTD Ex. 6 at 13). Accordingly, when Home

Point announced disappointing financial results on May 6, 2021, analysts expressed surprise and dismay. A UBS analyst, for example, downgraded Home Point based on "heavy" compression in its wholesale margins to "a level we did not expect [Home Point] to reach," and a Wells Fargo analyst expressed that he was "surprised" by this gain-on-sale margin decline, which he believed was "the main driver for the stock weakness." AC ¶66 (MTD Ex. 10 at 1; MTD Ex. 9 at 1).

In the May 6, 2021 earnings call, Home Point explained its decline in gain-on-sale margin by attributing it to two factors: "rising interest rates" and "competitor dynamics." MTD Ex. 7 at 4, 6; AC ¶63. Elbaum acknowledged that most of the decline in Home Point's margins had been "***frankly expected***," and that the "***expected component***" that made up most of that decline (from 158 to approximately 115 basis points) resulted from an excess of mortgage lending supply compared to demand, which had been undermined by rising interest rates. Elbaum also noted that "competitive dynamics" further contributed to the margin decline, from approximately 115 to 78 basis points. Specifically, Elbaum stated:

> I think there's a couple of dynamics. Number one is the dynamics that Willy [Newman] described in terms of this dislocation. And I think clearly, we have higher pull through and higher capacity. ***So there is more room in the funnel in terms of the supply/demand economic relationship. But I think that's part of the pressure and that was <u>frankly expected</u>***. I think the reason for the increased pressure is this competitive dynamics. So I would say some of that, but ***that would be the <u>expected</u> component, which is why we would go from, let's say, 158 basis points to, we would describe a more normalized level of 115***. The reason we're below that now, I think, is unrelated, and I think it

has to do with this unique competitive environment we're in.

AC ¶67 (MTD Ex. 7 at 11); *see also* MTD at 9 (acknowledging that Elbaum's statement concerning "the supply/demand economic relationship" explained "the impact on Home Point from the increased interest rates"). In the Prospectus, however, Home Point had misleadingly omitted its expectation that its margins would collapse, instead using words like "may" or "could" to describe the potential impact of changes in interest rates, and revealed that expectation only **after** the collapse occurred. AC ¶68.

Additionally, Home Point's May 6, 2021 earnings announcement made clear that the representations in the Prospectus that the Company had a "low-cost," "highly scalable" and "flexible" cost structure that could be scaled downward to maintain profitability in challenging market conditions were false and misleading when made. In fact, Home Point's costs resulting from its aggressive growth were largely locked in, and the Company was not in a position to reduce its expenses as market conditions deteriorated. Specifically, Home Point disclosed that its "total expenses of $227 million for the first quarter of 2021 are up from $84 million in the year ago quarter which reflects the capacity we added to accommodate the tremendous growth we have generated over the last year." AC ¶70. For example, the Company's largest expense category, compensation and benefits, had tripled since early 2020. AC ¶71. As market conditions worsened, Home Point's expenses only

grew, rising $4 million from the fourth quarter of 2020 to the first quarter of 2021. *Id.* Home Point's direct cost of wholesale origination had actually grown from $1,680 to "$1,700 to $2,000" per loan since early 2020—not scaled downward to match market conditions. AC ¶70.

The revelation of Home Point's rising costs, even as market conditions deteriorated, made abundantly clear that the Company's representations about its purportedly "low-cost," "highly scalable" and "flexible" cost structure had been false and misleading. As an analyst with Piper Sandler noted, Home Point's cost increase was "a focus . . . given pressure on origination margins," and unless the Company could achieve a "significant drop in expenses," its stock price would be "range-bound." AC ¶72; *see also* MTD Ex. 5 at 1. Likewise, a Wells Fargo analyst observed that Home Point's operating expense figures for the first quarter of 2021 were far above estimated levels, a JMP Securities analyst noted that the Company's "elevated levels" of operating expenses "may need to be rationalized in order to provide an adequate return to shareholders," and a UBS analyst asserted that any cost-cutting by Home Point had become "a 'show-me' story and we have limited visibility into whether these efforts will suffice to protect earnings." AC ¶72 & n.5 (MTD Ex. 9 at 1; MTD Ex. 8 at 2; MTD Ex. 10 at 1).

In short, on May 6, 2021, Home Point revealed both that its wholesale margins had collapsed due in large part to a rise in interest rates, as it had expected but not

disclosed, and that its cost structure did not allow for scaling down expenses to a significant degree in challenging market conditions as it had represented, but rather involved escalating, locked-in costs. In response, Home Point's stock price fell 17.7% to close at $7.72 per share on May 6, 2021, and continued to fall over the subsequent days as analysts continued publishing related reports.

### 4. Procedural Background

The original Complaint in this matter was filed on June 21, 2021. ECF 1. On September 10, 2021, the Court appointed Abdulaziz Jamal Johar Al-Johar ("Plaintiff") as Lead Plaintiff on behalf of a class of investors that purchased Home Point common stock in or traceable to the IPO. ECF 16. Plaintiff filed the Amended Complaint on November 9, 2021, asserting claims under Section 11 of the Securities Act against Home Point, its directors, those who signed its registration statement, and those named in the Prospectus as director nominees, and control person claims under Section 15 of the Securities Act against the Trident Stockholders and Stone Point (together, the "Stone Point Defendants") and the Individual Defendants. ECF 23. On January 10, 2022, Defendants moved to dismiss. ECF 26.

### ARGUMENT

On a motion to dismiss, the court must assess whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," drawing all "reasonable inference[s]" in the plaintiff's favor. *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009). Section 11 of the Securities Act imposes "strict liability" on issuers, and liability on directors and other designated persons, when a registration statement contains "an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading[.]" 15 U.S.C. § 77k(a); *J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 392 (6th Cir. 2008). Persons who control a violator of Section 11 are liable under Section 15 of the Securities Act. 15 U.S.C. § 77o.

### 1.    Home Point's Statements Were False And Misleading

Home Point's statements in the Prospectus were false and misleading because they failed to disclose that (i) Home Point actually expected reduced gain-on-sale margins as a result of higher interest rates, instead stating only that such increases "could" or "may" occur; and (ii) by aggressively expanding its wholesale lending business, including its Broker Partner network, Home Point had effectively locked in higher costs that it would not be able to shed in unfavorable market conditions.

Defendants respond by pointing to the Prospectus's patently inadequate risk disclosures. First, Defendants trumpet a supremely generic risk disclosure: "Initiating new business activities or strategies or significantly expanding existing business activities or strategies may expose us to new risks and will increase our cost of doing business." MTD at 13. That statement, which is true of every business, did not alter Home Point's repeated emphasis on its low, flexible, and scalable cost

- 12 -

structure. *See Helwig v. Vencor, Inc.*, 251 F.3d 540, 558-59 (6th Cir. 2001) (en banc) (rejecting "boilerplate warnings" that did not meaningfully inform investors), *abrogated in part on other grounds, Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007); *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1006 (S.D. Ohio 2008) ("generalized warnings about the types of risks which typically confront investors in most businesses" do not neutralize misleading statements). Moreover, the inadequacy of a "general warning" can be "demonstrated by the fact that, when investors learned the truth . . . they were surprised and disappointed[.]" *La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, 2021 WL 4397946, at *9-*11 (S.D. Ohio Sept. 27, 2021). Here, analysts reacted strongly when Home Point's high costs were revealed, notwithstanding this boilerplate warning. *See supra* at 10.

Defendants also cite Home Point's disclosure that "[i]nterest rate fluctuations ***could*** significantly decrease our results of operations and cash flows and the fair value of our assets." MTD at 13. But stating that a risk "could" come to fruition is misleading when a company conceals its true expectations, as Home Point did here. For example, in *Weiner v. Tivity Health, Inc.*, a statement that "health plan customers *could* attempt to offer services themselves that compete directly with our offerings" was found misleading when the defendant had become aware that a customer was going to do just that. 365 F.Supp.3d 900, 905, 908-910 (M.D. Tenn. 2019) (emphasis in original). Likewise, in *In re Compuware Sec. Litig.*, the defendants' "statement

- 13 -

that 'there can be no assurance that IBM will not choose to offer significant competing products in the future,' implied that IBM's development of competing software was a possibility as opposed to an actuality, and therefore, this statement does not qualify as *meaningful* cautionary language." 301 F.Supp.2d 672, 685 (E.D. Mich. 2004) (emphasis in original).[2] Here, Home Point implied that rising interest rates and lower margins were a mere possibility, while concealing that the Company expected this to occur. Even if Home Point had no independent duty to disclose that expectation, once a company chooses to speak on a topic, "it cannot choose half-truths." *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 569 (6th Cir. 2004).

Additionally, Defendants attempt to gloss over Elbaum's statements on Home Point's May 6, 2021 earnings call. MTD at 14. In fact, Elbaum divided Home Point's margin decline into two distinct categories: (i) the larger portion of the decline caused by rising interest rates, leading to lower demand in comparison to supply; and (ii) the smaller portion, caused by "competitive dynamics." AC ¶¶63, 65, 67. Elbaum then acknowledged that the larger portion of the decline caused by rising interest rates had been "***frankly expected***," and characterized that portion as the

---

[2]     Defendants cite the unpublished decision in *Bondali v. YumA Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015) (MTD at 14), but omit its acknowledgment that "there may be circumstances under which a risk disclosure might support" liability. *Id.* at 491. In any event, *Bondali* is non-binding, and did not suggest any change in the law. *Weiner*, 365 F.Supp.3d at 909.

- 14 -

"*expected component*." AC ¶67. Defendants' contention that Elbaum was only stating what Home Point expected *after* the IPO took place, and only *after* interest rates had already risen, is unsupported by the text and would render his statement essentially meaningless. Defendants are free to raise their strained interpretation at summary judgment and trial, but it does not support dismissal.[3]

### 2. Home Point's Statements and Omissions Were Material

Information is material if there is "a substantial likelihood" that the false statement or "the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Materiality is "inherently fact-specific." *Id.* at 236. "As such, a court may only determine that a statement or omission is not material as a matter of law if the alleged misrepresentations or omissions are so obviously unimportant to a reasonable investor that reasonable minds cannot differ on the question of materiality." *Cardinal Health*, 2021 WL 4397946, at *4.

Defendants do not, and cannot, dispute the materiality of the statements and

---

[3]    Defendants also discuss post-IPO disclosures and analyst reports (MTD at 15-16), which actually go to loss causation (*i.e.*, whether the May 6, 2021 disclosures were corrective given intervening statements) and are thus addressed below. Conversely, Defendants' purported loss causation arguments that actually concern whether Home Point's statements were misleading (MTD at 24) are addressed here.

omissions in question as a general matter, given the importance to Home Point of the margins and costs associated with its wholesale lending business. Rather, Defendants make narrow arguments concerning certain of these statements and omissions. As set out below, Defendants' arguments are wrong.

### a.     Home Point's Statements Were Not Immaterial Puffery

Defendants' argument that certain of Home Point's statements about its costs were "soft" information or immaterial "puffery" (MTD at 18-21) is simply incorrect. As an initial matter, "even with 'soft information,' a defendant may choose silence or speech based on the then-known factual basis, but it cannot choose half-truths." *Ford*, 381 F.3d at 569. Home Point's misleading half-truths are at the core of this case. As the Sixth Circuit has made clear, "the protections for soft information end where speech begins." *Helwig*, 251 F.3d at 560.[4]

As to puffery, "loosely optimistic statements" that are "too untethered to anything measurable . . . to communicate anything that a reasonable person would deem important to a securities investment decision" may be "deemed immaterial."

---

[4]     *Helwig* also distinguished two cases cited by Defendants (MTD at 19), noting that (1) in *In re Sofamor Danek Group, Inc.*, 123 F.3d 394 (6th Cir. 1997), "the information claimed as adverse to the company had already been disclosed," and (2) *Starkman v. Marathon Oil Co.*, 772 F.2d 231 (6th Cir. 1985) was a pure "nondisclosure" case that, in any event, predated the PSLRA and thus had little relevance. *Helwig*, 251 F.3d at 560-62.

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005). However, "[t]he context of statements is often telling." *Id.* at 672. "What might be innocuous 'puffery' . . . standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *Id.* Individual words "must not be assessed in a vacuum . . . by plucking the statements out of their context to determine whether the words, taken per se, are sufficiently 'vague' so as to constitute puffery[.]" *Id.*

Considered in the context set out in the Amended Complaint, Home Point's repeated statements about its cost structure were framed as material reassurances to IPO investors that the Company (1) was differentiated from its competitors due to its low costs, and (2) had the flexibility to promptly scale down its costs in adverse business conditions. *See Helwig*, 251 F.3d at 555 (projections "were framed as material reassurances" and were not "so uncertain or casually disregarded by the marketplace" as to be immaterial); *In re UICI Sec. Litig.*, 2006 WL 7354417, at *7 (N.D. Tex. Sept. 29, 2006) (statements emphasizing company's "ability to obtain low-cost financing" were not immaterial puffery). Market analysts emphasized the importance of Home Point's cost structure to its profitability (*see supra* at 10), underscoring the materiality of these assurances. *See Sheet Metal Workers Local 19 Pension Fund v. ProAssurance Corp.*, 2021 WL 5866731, at *16 (N.D. Ala. Dec. 10, 2021) (analyst reactions showed that statements were not immaterial puffery).

- 17 -

Home Point's numerous statements touting its low-cost model did not merely express "general optimism," but asserted "a relationship between data and a conclusion, one that a finder of fact could test against record evidence." *Bridgestone*, 399 F.3d at 674. That these statements were "qualitative" does not render them immaterial. *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 387 (S.D.N.Y. 2012); *see also Helwig*, 251 F.3d at 563 ("Materiality is about marketplace effects, not just mathematics."). Defendants certainly have not shown that Home Point's statements were "obviously unimportant" and that "reasonable minds could not differ," as required to secure dismissal on materiality grounds.[5]

### b. Safe Harbor for Forward-Looking Statements Is Not Applicable

Defendants also try to invoke the safe harbor provision of the PSLRA, which protects certain "forward-looking statements" that are accompanied by "meaningful cautionary statements," 15 U.S.C. § 77z-2(c)(i)(A)(1), as to a subset of Home Point's statements about its cost structure. MTD at 21-22.[6] However, under the PSLRA, the

---

[5]   *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1320 (11th Cir. 2019) (that a statement "smacks of puff" does not prove immateriality on motion to dismiss unless it is "so obviously unimportant" that "reasonable minds could not differ"); *see also In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 472 (6th Cir. 2014) (court "must tread lightly at the motion-to-dismiss stage" in evaluating puffery argument, "engaging carefully with the facts of a given case and considering them in their full context").

[6]   Defendants attempt to frame these statements as examples by using the signal "*See, e.g.*" (MTD at 21), but Plaintiff cannot be required to guess which other statements Defendants might consider to fall within the safe harbor. Any argument

safe harbor is inapplicable to statements "made in connection with an initial public offering[.]" 15 U.S.C. § 77z-2(b)(2)(D); *see Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*, 966 F.Supp.2d 525, 556 (M.D.N.C. 2013) (safe harbor "does not apply to statements made in an IPO"). Defendants' argument is thus entirely off-base.

Furthermore, the relevant content of these statements is not "forward-looking." Each statement identifies a purportedly existing feature of Home Point's business, such as its "highly leverageable cost structure." A "statement of present or historical fact . . . [is] not subject to the safe harbor provision of the PSLRA." *Miller v. Champion Enters. Inc.*, 346 F.3d 660, 678 (6th Cir. 2003).[7] For example, in *In re QuantumScape Sec. Class Action Litig.*, 2022 WL 137729 (N.D. Cal. Jan. 14, 2022), a company's statement that it "expect[ed]" its approach "should" lead to lower costs was held to be not forward-looking as to its content concerning the company's existing business model. *Id.* at *14. Statements about Home Point's low-cost model are likewise "separable" from any forward-looking content, *Miller*, 346 F.3d at 679, as shown by the fact that Defendants identify purportedly forward-looking language in proximity to only a minority of these statements.

---

that other statements fall within the safe harbor has been waived. Defendants have also waived any puffery argument for statements they have not identified as such.

[7]     *See also In re Lason, Inc. Sec. Litig.*, 143 F. Supp. 2d 855, 860 (E.D. Mich. 2001) ("While these statements were mixed with forward looking statements, the actionable statements were based on fraudulent historical and current facts.").

These statements are also not protected by the safe harbor because they are not accompanied by meaningful cautionary language, which "must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements[.]" *Helwig*, 251 F.3d at 558-559. "[B]oilerplate warnings will not suffice[.]" *Id.* at 558. Here, Defendants cite the absurdly generic risk disclosure that Home Point may face "exposure to new risks and increased costs as a result of initiating new business activities or strategies or significantly expanding existing business activities or strategies[.]" MTD at 22. This warning, which is true of every company, conveys no meaningful information. The other two disclosures Defendants cite – about the potential for "industry competition" and "the impact of interest rate fluctuations" – have *nothing to do* with the purportedly forward-looking statements that Defendants identify, each of which concerns Home Point's cost structure. Because none of Home Point's risk disclosures "address that alleged misrepresentation with any particularity," none are meaningful cautionary language, and the safe harbor is thus inapplicable. *QuantumScape*, 2022 WL 137729, at *14.[8]

---

[8]     *See also UICI*, 2006 WL 7354417, at *6 (same). In addition, "[t]he inadequacy of Defendants' cautionary language is demonstrated by the fact that, when investors learned the truth . . . they were surprised and disappointed[.]" *Cardinal Health*, 2021 WL 4397946, at *11; *see supra* at 10 (analyst reactions).

- 20 -

### c.      Items 303 and 105 of Regulation S-K Further Support Materiality

Item 303 of SEC Regulation S-K requires issuers to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(b)(2)(ii). Item 105 requires a "discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §229.105(a). These requirements are "probative as to whether . . . omitted information was material." *In re F & M Distribs. Inc. Sec. Litig.*, 937 F.Supp. 647, 654 (E.D. Mich. 1996). Home Point's misleading representations about its cost structure and about interest rates and margins implicate trends, uncertainties, and risks that Items 303 and 105 require to be disclosed accurately. *See, e.g.*, *Wallace v. Sys. & Comput. Tech. Corp.*, 1996 WL 195382, at *9 (E.D. Pa. Apr. 19, 1996) (cost increases implicated Item 303). Defendants' response that these factors manifested too quickly to constitute a "trend" (MTD at 18) is simply incorrect. *See Schuh v. HCA Holdings, Inc.*, 947 F.Supp.2d 882, 891-92 (M.D. Tenn. 2013) (two-month trend can implicate Item 303).[9]

---

[9]    Defendants' remaining arguments concerning Items 303 and 105 (MTD at 16-17) merely repeat the flawed arguments made in other portions of their brief.

### 3.   Affirmative Defense of Loss Causation Does Not Support Dismissal

Defendants also contend that the Amended Complaint should be dismissed on loss causation grounds. MTD at 22-25. "Loss causation, however, is not an element of a § 11 claim, but an affirmative defense to it." *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 947 (6th Cir. 2009) (citing 15 U.S.C. § 77l(b); holding that "the district court erred in dismissing this claim on that ground").[10] "Affirmative defenses are best left for adjudication on motions for summary judgment or at trial," and "the only way [defendants] could succeed on this affirmative defense at the motion-to-dismiss stage" is if plaintiffs have "pled themselves out of court by demonstrating that it is impossible for them to demonstrate loss causation." *In re Regions Morgan Keegan Sec., Deriv., and ERISA Litig.*, 2010 WL 5464792, at *5 (W.D. Tenn. Dec. 30, 2010).

Though not required at this stage, there is nonetheless a clear link between the false and misleading statements and omissions at issue and the 17.7% decline in the Company's stock price on May 6, 2021, along with the continued decline over the

---

[10]   Even in cases brought under Section 10(b) of the Securities Exchange Act of 1934, where loss causation must be pleaded, "at the pleading stage, a plaintiff need only provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 695 (6th Cir. 2017); *id.* at 697-698 (holding that it was "plausible that the market first learned the full extent" of the truth via the alleged corrective disclosure).

subsequent days. AC ¶74. On May 6, 2021, Home Point revealed that its margins had collapsed due to rising interest rates, as it had previously expected but not disclosed, and that its costs had not scaled down in these conditions, but instead had grown substantially. AC ¶¶59-74. Analysts focused on these new developments, and linked them to the decline in Home Point's stock price. *See supra* at 8, 10.[11]

Defendants' attempts to show that a lack of loss causation is apparent on the face of the Amended Complaint amount to very little. First, Defendants note that Home Point's stock price also declined between the IPO and the corrective disclosures on May 6, 2021. But that does not prove, or even suggest, that the stock price decline on May 6, 2021 and thereafter was unrelated to Home Point's false and misleading statements and omissions. *See Gaynor v. Miller*, 273 F.Supp.3d 848, 870 (E.D. Tenn. 2017) (price decline prior to corrective disclosure did not establish lack of loss causation on motion to dismiss Section 11 claim).

Defendants also point to statements by the Company and analysts both before and after May 6, 2021 to argue that the corrective disclosures did not reveal new information. Those statements, however, indicated that *competitive dynamics*, such

---

[11]     By contrast, in *Azzolini v. Corts Trust II*, 2005 WL 3448053 (E.D. Tenn. Dec. 14, 2005), which Defendants cite, there was "*no relation*" between the misstatements and investor losses, as the truth was revealed "*two years* before [plaintiffs] claim they suffered any losses," and the price of the security "remained steady over one year" after that initial revelation. *Id.* at *6. That is entirely different from this case.

as a pricing war involving Rocket Mortgage and United Wholesale Mortgage, were putting pressure on margins, not that the Company expected *interest rates* to rise and margins to fall as a result. On May 6, 2021, Elbaum expressly contrasted the smaller portion of the Company's margin decline caused by competitive dynamics and the larger, "expected component" caused by interest rate increases. *See supra* at 8-9. This was new information, and the market reacted sharply to it.

Defendants also cite a statement by Elbaum on March 11, 2021 that "roughly 1/3 of [Home Point's] expenses are variable." MTD Ex. 6 at 10. That statement did not reveal what the market learned on May 6, 2021: that the Company's statements that it had a low-cost, flexible, and highly scalable model were misleading, as Home Point's costs grew even as its margins shrank. Further, the March 11, 2021 statement, including Newman's follow-on statement on the same page, highlighted the Company's purportedly improving cost "efficiencies," continuing the misleading messaging that was not corrected until May 6, 2021. *Id.* In any event, arguments about whether certain disclosures are corrective in light of intervening statements are "not ripe for the Court to decide" on a motion to dismiss. *La. Mun. Police Emps. Ret. Sys. v. KPMG LLP*, 822 F.Supp.2d 711, 725 (N.D. Ohio 2011).

Lastly, Defendants posit that Home Point's stock price decline in the days immediately after May 6, 2021 is not linked to the disclosures that day. However, information can sometimes take more than one day to be reflected in market prices.

- 24 -

*See, e.g.*, *Pelletier v. Endo Int'l plc*, 338 F.R.D. 446, 486 (E.D. Pa. 2021). Here, analysts continued to report on Home Point's May 6, 2021 disclosures for days afterward. AC ¶74. Ultimately, the proper time period in which to measure investor losses will be a matter for summary judgment and trial.

### 4. Individual Defendants and Stone Point Defendants Are Subject to Control Person Liability

Defendants do not dispute that the Amended Complaint adequately alleges that the Stone Point Defendants and Individual Defendants (apart from Goodman and Morse) controlled Home Point at the time of the IPO, and thus are subject to Section 15 liability if Section 11 liability is established. Because Defendants do not dispute that Goodman and Morse are subject to direct Section 11 liability as director nominees, Plaintiff withdraws his Section 15 claims as to those two Defendants only.

### CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

DATED: March 11, 2022

*/s/ Jonathan Zweig*
JONATHAN ZWEIG

ROBBINS GELLER RUDMAN &
 DOWD LLP
CHAD JOHNSON
JONATHAN ZWEIG
420 Lexington Avenue, Suite 1832
New York, NY 10170
Telephone: 212/432-5100
chadj@rgrdlaw.com
jzweig@rgrdlaw.com

*Lead Class Counsel*

- 25 -

VANOVERBEKE, MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD (P42641)
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

*Local Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I, Jonathan Zweig, hereby certify that on March 11, 2022, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

<em>/s/ Jonathan Zweig</em>

JONATHAN ZWEIG