**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ROBERT WINDEMUTH AND
ROBERTA WINDEMUTH,
Individually and on behalf of all
others similarly situated,

                    Plaintiff,

                                Case No. 21-11457

  -v-

HOME POINT CAPITAL INC.,
WILLIAM A. NEWMAN, MARK
E. ELBAUM, AGHA S. KHAN,
STEPHEN A. LEVEY, AND ERIC
L. ROSENZWEIG,

                    Defendant.
_____/

**MOTION HEARING**
BEFORE THE HONORABLE SHALINA D. KUMAR
United States District Judge
600 Church Street
Flint, Michigan
Thursday, August 11, 2022

APPEARANCES:
FOR THE PLAINTIFF:   JONATHAN ZWEIG
                       CHRISTOPHER CHAD JOHNSON
                       Robbins Geller Rudman & Dowd LLP
                       420 Lexington Avenue, Suite 1832
                       New York, NY 10170

                       FRANCIS E. JUDD
                       VanOverbeke, Michaud
                       79 Alfred Street
                       Detroit, MI 48201

APPEARANCES:
(Continued)

FOR THE DEFENDANT:     CRAIG WALDMAN
                       Simpson Thacher & Bartlett LLP
                       425 Lexington Avenue
                       New York, NY 10017

                       ANDREW J. KOLOZSVARY
                       Dykema Gossett
                       400 Renaissance Center
                       Detroit, MI 48243

**To Obtain a Certified Transcript Contact:**
Christin E. Russell
FCRR, RDR, CRR, CSR - (248) 420-2720
Proceedings produced by mechanical stenography.
Transcript produced by computer-aided Transcription.

<u>TABLE OF CONTENTS</u>

<u>Motion Hearing</u>                                                    <u>Page</u>

  Argument by Mr. Waldman                                      4

  Argument by Mr. Zweig                                       14

  Rebuttal by Mr. Waldman                                     28

<u>Exhibits:</u>
                    (None Offered.)

CERTIFICATE OF REPORTER                                       31

Flint, Michigan

August 11, 2022

10:00 a.m.

                              *      *      *

      (Call to Order of the Court; all parties present.)

             THE CLERK:  The Court will now hear civil Case No. 21-CV-11457, In Re: Home Point Capital, Inc. Securities Litigation.

             Would counsel please place your appearances on the record, beginning with Plaintiff.

             MR. JUDD:  Good morning.  Francis Judd on behalf of the plaintiff.

             MR. ZWEIG:  And Jonathan Zweig from Robbins Geller on behalf of lead plaintiff as well.

             MR. JOHNSON:  Chad Johnson with Robbins Geller as well.

             THE COURT:  Good morning.

             MR. WALDMAN:  Good morning.  Craig Waldman from Simpson Thacher on behalf of Defendants.

             MR. KOLOZSVARY:  Good morning.  Andrew Kolozsvary, Dykema Gossett on behalf of Defendants.

             THE COURT:  Good morning.  Go ahead.

             MR. WALDMAN:  Thank you, your Honor.

             As you said, Craig Waldman from Simpson Thacher on behalf of the defendants.

First of all, thank you, to the Court, for having us in person. Most of us haven't had a chance to do this in quite a long time, but we're glad to, I think all of us are glad to be here.

Your Honor, just to set the stage, in order to sustain a complaint for an alleged violation of Section 11 of the Securities -- 1933 Securities Act, a plaintiff must allege the material misstatement or omission in the offering document, here, Home Point's IPO, initial public offering documents, and that the material misstatement or omission existed at the time that the registration statement for the offering became effective. For certain subcategories of Section 11 claims, a plaintiff must also show that the alleged misstatement or omission was known to management at the time that the alleged misstatement or omission occurred.

Plaintiffs allege here that Home Point's January 2021 IPO documents were misleading in two respects; namely, the first is that its statements in its IPO documents that its "flexible, highly scaleable, or differentiated cost structure" were misleading; and second, that the company purportedly omitted that an increase in interest rates was expected to hurt the company's gain-on-sale margin and that the company knew that at the time of the IPO.

Plaintiff makes these allegations in the wake of a May 2021 earnings announcement, five or so months after the

offering where Home Point missed consensus estimates by approximately $42 million.  Among fuller explanations about how the business was performing on May 6th, Home Point cited increased competition in its sector and increasing interest rates.

To be clear, from the defendants' perspective, shortly after its IPO in January of 2021, Home Point faced two adverse developments.  One was a hardening competitive landscape, and two was increasing interest rates in early 2021.  As a result, Home Point's financial results declined.

What struck me as I read the amended complaint and these papers, again in preparation for this argument, is that the statements that are being challenged here are not false and misleading for three reasons, from our perspective.

First, there is no credible allegation that the statements were false when made in January of 2021.  Rather, what the amended complaint does is it looks at statements and things that happened in March and April of 2021, three, three months or so after the offering and then impermissibly says that the January offering documents must, therefore, have been wrong.  That's not proper Section 11 pleading.

Second, the company had appropriately warned investors about the types of risks that actually materialized after the IPO.  As laid out in our papers, the company had discussed as risks of these investments the two very things that ultimately

happened:  First, rising interest rates and increased competition that could hurt its gain-on-sale margin.  And to quote from the IPO documents, they said interest rate -- "interest rate fluctuations could significantly decrease our results of operations."

Second, the company warned about the potential inability to offset increased costs with additional revenues.  And I'll quote again, the company's "efforts may not succeed and any revenues we earn from any new or expanded business initiative or strategy may not be sufficient to offset the initial and ongoing costs of that initiative."

Plaintiff's attempts to describe these disclosures as either generic or inconsistent with some then-existing fact does not hold water.  Plaintiff can only support his, his claim by misreading or simply misunderstanding statements that management made later.

And in particular, the complaint, the plaintiff's complaint rests on the theory that management withheld from investors knowledge that it had about future actions of an independent third party, that third party being the Federal Reserve.  And as I'll go into in a few moments, the company doesn't have any insight into what the Federal Reserve will do in the future which is why it warns of risks related to actions that the Federal Reserve may take.

Last but not least, the statements at issue in this

case are the type of statements that courts routinely hold to be inactionable either because they are puffery or because they are forward-looking, forward-looking statements that are couched with meaningful cautionary language.  And courts routinely hold that those types of statements are not actionable under the Federal Securities laws.

With that introduction, I'll just try to touch on each of these in a little bit more depth without repeating everything that's in our papers, because I know that won't be helpful.  But let me just, if, if the Court is amenable to it, give you a little bit more meat to sort of what I just said is the three reasons I don't believe any of the statements are false or misleading.

Okay.  So the first reason is because there really is no credible allegation that the statements made here were wrong at the time they were made.  So let me take both statements in turn and start with the gain-on-sale margin.

With respect to the gain-on-sale margin, what the plaintiff does in his complaint is point to things that happened in April, three months after the January 2021 offering.

So just to quote out of the complaint at paragraph 13, in discussing why Home Point's disclosures about its gain on sales was wrong, Plaintiff says, "Its gain-on-sale margin had deteriorated from 200 basis point in the fourth quarter of 2020

to 128 basis points in the first quarter of 2021."

The paragraph goes on to say, "For the wholesale channel in particular, Home Point revealed that its gain-on-sale margin had collapsed to approximately 78 basis points in April 2021."  That's three months after the offering. In addition, at paragraph 65, the plaintiff quotes Mr. Elbaum, the company's CFO who addressed this same issue squarely during that May 6th earnings call:

"As a result, gain-on-sale margins, particularly in the wholesale channel have been under significant pressure. While we started to see some signs of that at the end of the first quarter, wholesale margins continue to trend lower as we enter the second quarter."

The plaintiff is taking things that happened late in the first quarter and in April of 2021, months after the IPO, and saying that makes the statements that were made in January false.  In our view, that's impermissible Section 11 pleading.

With respect to the allegations about costs, moreover, the plaintiff points to events in the first quarter of 2021 rather than saying that they existed at the time of the offering in January of '21.

In discussing Home Point's disclosures about its cost structure were wrong, Plaintiff says in his complaint at paragraph 15, "In its May 6th, 2021 earnings call, Home Point disclosed that its expenses had soared from 84 million in the

first quarter of 2020 to 227 million in the first quarter of 2021, and had increased from the fourth quarter of 2020 to the first quarter of 2021 even as interest rates rose and margins declined."

These are events, your Honor, that happened during the first quarter of 2021 including in February of 2021 and March 2021 after the offering. So Defendants believe Plaintiffs have not pled that the statements were wrong when made in January of 2021.

Beyond that, the second point is that the IPO document itself warned of these very risks. With respect to the allegations about gain-on-sale margin, the offering documents specifically warned that rising interest rates could hurt the gain-on-sale margin. As I said to your Honor before, this is page 45 of the IPO documents which is Exhibit 3 to my brief, "interest rate fluctuations could significantly decrease and -- could significantly decrease our result of operations and the company warned that competition from mortgage loan assets may compress margins and reduce yields."

And just to quote again from Exhibit 3 which is the IPO documents itself, at pages 36 and 37, the company said, "Competition for mortgage assets may limit the availability of desirable originations, acquisitions, and result in reduced risk-adjusted returns and adversely affect our business financial condition, liquidity and results of operations."

Let me just stop here, your Honor, to make the point that I made a little bit earlier, but with a little bit more context around it. In Plaintiff's brief, Plaintiff acknowledges the warnings the company gave in its IPO document about interest rates. So on page 7 of its, of its opposition, excuse me, page 6 of its opposition, it quotes at the bottom of the page what I read to you: "Interest rate fluctuations could significantly decrease our results of operations and cash flows and the fair value of our assets." Plaintiff quotes that in the brief.

Then flipping to page 7, this is what the plaintiff says about the warnings that Home Point issued in this regard; quote from the brief:

"Home Point also touted a tailwind behind its origination business based on a statement that the Federal Reserve was expected to maintain interest rates at their current levels through 2023. Home Point misleadingly omitted, however, that it actually expected interest rates to rise and its margins to decline."

That's a quote from Plaintiff's brief. What that says is Home Point knew better than the Federal Reserve what the Federal Reserve would do with interest rates.

I submit to your Honor that the company appropriately described the risk, but it did not have any special knowledge of what the Federal Reserve would do with interest rates that

would contradict what the Federal Reserve itself had said about interest rates.

With respect to their allegations about costs, moreover, the offering documents warned that Home Point could be exposed to new risks and additional costs of doing business from its -- expanding its business operations, and that such costs could not be offset by revenues of those expanded operations.  That's at Exhibit 3, which is again the IPO document at page 43.  Given these disclosures in the offering documents, Plaintiff cannot now say the company's offering documents were false and misleading.

Third, your Honor, the statements at issue here are the types that courts routinely find to be inactionable as puffery or forward-looking statements.  So just to highlight, and we've put this in our brief, but just to highlight a couple of examples, one only need look at paragraphs 50 and 51 of the plaintiff's complaint to see the forward-looking nature of the statements that are being pursued here.

So in looking at paragraph 50, the second statement that's quoted, the first sentence says, "These efforts have resulted in rapid growth in our originations and profitability."  And then it says in bold, bold done by the plaintiff, "As we continue to grow, we believe the scalability of our partner-driven business model will produce significant operating leverage."

Throughout the rest of this paragraph, it's littered with, "we believe that," "we expect," "we believe" throughout the paragraph 50 and 51 where Plaintiffs quote from these statements.

I won't read all of them, your Honor, but in the context of an IPO, Home Point's statements about what it expected or believed regarding its general business prospects are protected as forward-looking statements. And courts have applied this, and we've demonstrated that with case law we've cited to you in the brief.

In addition, many of the statements in paragraphs 50 and 51 of the complaint are classic puffery from the case law. Courts in this circuit and from around the country have analyzed exactly the type of language in the offering documents highlighted by Plaintiffs, including that Home Point had a "highly leverageable, scaleable, flexible cost structure," and found that that such statements are puffery.

In looking at paragraph 51, I highlighted a number of what the plaintiff himself bolded in the complaint, and we see classic puffery terms like "best in class," "flexible," "highly leverageable." And we've provided your Honor with case law to say that in this context, we believe these statements are puffery and not actionable.

Your Honor, I would just mention two other things before I sit. We also put in our brief that we don't believe

the plaintiffs have any well pleaded allegations of loss causation here because we don't believe any new information entered the market on May 6th. The company spoke to the market in March and talked about its costs. The rising interest rates was well known to the market just in general.

And finally, because Plaintiff's Section 11 claim fails in our view, its claim for control person liability would also fail, your Honor, because in order to, to pursue a claim of control person liability, there has to be an underlying violation.

So, your Honor, that is all I had as prepared remarks for today. The rest of what we argue is obviously in our briefs and I don't want to repeat it all.

So thank you, your Honor.

MR. ZWEIG: Thank you, your Honor. Jonathan Zweig, as I mentioned, from Robbins Geller for the lead plaintiff. And I second Mr. Waldman's remarks about having this argument in person, which is, which is very nice. I'd like to respond to Mr. Waldman's points but first take a step back to discuss the context of this case.

In January of 2021, when Home Point was coming to market, it was coming to market for the first time presenting its business and its stock to investors for the first time, and as such, investors had extra protections beyond what they would have in a stock of a well established company under the market

under Section 11. And what that essentially boils down to is that the defendants were required to be accurate with respect to all of the material disclosures in their offering documents. And as we allege, the defendants failed to do that.

And I would also note by way of background, and this is not disputed, I don't believe, between the parties, that Home Point's wholesale lending business, which is the subject of the misrepresentations and misleading omissions that we allege, was by far the largest and most significant part of its business, a part of its business that investors and analysts were very focused on. And with respect to that business, Home Point made two major categories of misleading statements and omissions. The first relates to Home Point's expectations surrounding interest rates and what that would do to its margins, which are core to its profitability. As was revealed later in May of 2021, Home Point had expected that interest rates would rise and that would severely decrease its margins; however, it didn't reveal that expectation until it had already occurred.

Secondly, Home Point hammered home in its offering documents the idea that it was a low-cost operator; that its cost structure was very flexible, highly leverageable and highly scaleable, essentially meaning it had the ability to ramp up and down its costs depending upon the business environment that it was in.

So in essence, your Honor, Home Point omitted the fact that it saw a storm on the horizon with respect to increased interest rates. Instead, couching its understandings about interest rates using words like "could" and "may" and equivocal language like that, which courts have held are misleading when a company, in fact, has an expectation about what's going to happen. And but in addition, Home Point said, well, even if that storm does come, we're protected, we can weather it because we can adjust our -- we have the cost structure in place now to adjust our costs up and down to, to correlate with the business environment that we face.

It was revealed in May of 2021 that those disclosures were false. In fact, it was I believe Mr. Elbaum, Home Point's CFO, said we frankly expected interest rates to rise and our margins to be significantly affected as a result. And Home Point also revealed that even though the business environment had gotten significantly worse due to those increased interest rates, in fact, it hadn't cut its costs at all. Costs had, in fact, risen significantly. So Home Point did not have that flexible, leverageable, scaleable cost structure that it touted on at least 11 separate occasions within its offering documents.

I would also note just by way of introduction that a lot of the defendants' arguments go to materiality in one way or another, but the case law is very clear that at this stage,

a claim can only be dismissed on materiality grounds if it is obvious to anybody, if reasonable minds cannot differ, in fact, as to the materiality one way or the other of the statement. So it's a very high bar for Defendants to meet to try to have this claim dismissed on these grounds. And we submit that they have not done so.

With that, your Honor, I'd like to turn to the defendants' specific arguments, why they believe this claim should be dismissed. Certainly arguments are set forth in our brief, and I'm happy to focus on the arguments that Mr. Waldman has chosen to highlight today.

The first argument that he highlights is the idea that somehow we haven't alleged that the statements were falsely made, and that's simply not accurate. What we're alleging, I'll start with the costs side of things and then turn to interest rates. When it comes to costs, our allegation -- well, Home Point, as I said, hammered home the idea that it had this low cost flexible cost structure. That is an allegation about Home Point's business, about the way that its, about the way that its costs are structured, whether that's compensation for employees, technology costs, administrative costs, all the different kinds of costs that a mortgage originator like Home Point would have. And so it's -- and that representation was revealed to be misleading only a few months later in May of 2021 when the business environment had gotten worse due to the

increased interest rates.  But in fact, costs had gone up rather than, rather than going down, which would, which would be indicative of the flexible cost structure that Home Point was touting.

So certainly it's common place in securities cases that one would have a misleading statement, and that, excuse me, that there would be a gap of some amount of time before it was revealed that it was false.  Typically, that wouldn't be the very same day by any means, whether that's with a corrected disclosure or materialization of a risk coming to bear that, that the defendant had made a misleading statement about. Frankly, in this situation, I think it's a rather tight timeline in terms of the misleading statements and omissions being made and then the truth being revealed.  I'm not talking about years later, as one would see in many cases.

And the same, your Honor, is true on the interest rates point.  What we're alleging is that Mr. Elbaum revealed in May of 2021 that Home Point had, as he puts it, frankly expected that interest rates would rise and margins would decrease.  At this stage, the defendants certainly aren't entitled to an inference that that expectation arose somehow in that short window between the IPO and, and May of 2021; that will presumably be a matter for discovery.  But at this point, the inference, the reasonable inferences run to the plaintiff and not to the defendant.

Secondly, I'd like to address the question of whether the, whether the risks were adequately disclosed.  And I'll begin with the cost point.  The statement that the defendants hang their hat on, they say multiple times in their papers, is this statement:

"Initiating new business activities or strategies or significantly expanding existing business activities or strategies may expose us to new risks and will increase our cost of doing business."

We would submit, your Honor, that that's a boilerplate generic disclosure that, in fact, it's hard to think of a company that that wouldn't be true of, that having new business activities may expose us to risks and costs.  That, in no way, neutralized the specific and repeated many times statement by the defendants that its low-cost model gave it this flexibility and this, and this advantage in the marketplace.

Additionally, with respect to the interest rates point, our argument is that it is the risk disclosures themselves that were the misleading statement.  So the argument from defense is a little bit incongruent in that respect.

Our argument is that it was the statements that interest rates could or may have an effect on our margins that were misleading when, in fact, as Mr. Elbaum later acknowledged in an earnings call, Home Point had frankly expected that to occur, but had not, had not revealed that.

And we cite multiple cases in our, in our papers where, where statements couched as it "could" or "may" statement are considered misleading. And I would particularly point, your Honor, to the *Helwig* decision out of the Sixth Circuit where the question related to the effect of proposed legislation on a particular company. And the argument from the defendants in that particular case was, well, how are we supposed to know what Congress is going to do, and exactly what, precisely what effect that will have on our earnings. And the court rejected that argument and said that because the company expected that legislation to pass and expected it to have a significant impact on its earnings, therefore, therefore, it was an actionable statement. And the idea that there's some third party intermediary, whether it's the Federal Reserve, as Mr. Waldman pointed to, or Congress in the *Helwig* case, nonetheless a company can have expectations about events that will affect its business, and it has to be honest and accurate about those expectations and certainly can't mislead the market about them. And that's precisely what occurred here.

I'll take a sip of water, your Honor.

Your Honor, and I would also note lastly on the risks being disclosed, purportedly pointed, that some of the disclosures that are raised relate to competition very generally, you know, we could have competition and that could

effect our business. That's also a generic disclosure. And frankly, it's not even particularly on point with the, with the issues related to interest rates and costs that we're raising. And the cases are very clear that cautionary language just doesn't help the defendant unless it's addressed to the, to the point that the allegations relate to. Certainly just about any prospectus is going to have some pages of risk disclosures, but if they are generic and don't relate to the issues at hand, then it doesn't mean the statements were misleading. It doesn't help the defendants.

I'd like to turn now to the puffery and the forward-looking statements issue. It's interesting that these are combined in the argument because they are different in important ways, and one was waived.

And so I'll start with the forward-looking statements where, in their papers, the defendants cite to the statutory safe harbor under the PSLRA. The problem is that statutory provision has a very specific and clear statement that it does not apply to initial public offerings, which is what this was.

Now, in their reply, the defendants attempt to shift gears and move to the bespeaks caution doctrine, but clearly an argument raised for the first time in reply is waived. We didn't have the opportunity to respond in writing. On top of that, they are different doctrines. For example, the statutory safe harbor doesn't require meaningful cautionary language if a

defendant can show that they -- if the defendant can show that they had no actual knowledge and the statement was false.  So that's just an example of a difference between these doctrines.  One is a common law doctrine, the other is from statute.  And so the argument about forward-looking statements was waived.  But even if it weren't waived, your Honor, it still is not applicable for two reasons.  First of all, for the reason that I mentioned, which is that the cautionary language that the defendants point to here was not meaningful.  It was boilerplate.  It was not addressed to the risks, the specific risks that we're talking about in our case and, therefore, that doctrine does not apply.  And secondly, the language in question was, was not forward-looking in terms of the actual substance that we are alleging was false and misleading.

What we allege, for example, on the costs point, is that Home Point was making statements about its existing cost structure.  Now, certainly there are articulated beliefs based on that.  So then they said we have a flexible, low-cost structure, and because of that, we believe that we are going to be profitable in the future, just to paraphrase.  But that belief part of it is separable and should be separated from the statement of purportedly existing fact about Home Point's existing cost structure.  So even if the -- even if they can shift gears in their reply to the bespeaks caution doctrine, which I submit they shouldn't be able to do, that doctrine

still would not keep -- would not be applicable here.

With respect to puffery, your Honor, I would first note that puffery is not some sort of standalone inquiry.  It's part of a materiality inquiry where the standard, as I pointed out at the start, is very difficult for Defendants to meet at the motion to dismiss stage.  But even beyond that, the cases in the Sixth Circuit such as the *City of Monroe vs. Bridgestone* case and others that we cite in our brief are clear that puffery is not some sort of mechanical exercise of plucking a word out of a vacuum and saying, well, this word is always puffery or this word is not always puffery.

The cases are all clear that one has to look at this in context, and that if a company is making material reassurances to investors about an important point about the company, then, then the statements are considered material.  They are not considered to be immaterial puffery.

And I would particularly like to point your Honor to one, to one case.  And let me take a step back, actually, because I think what underlies some of the defendants' arguments is that the representations we're pointing to are in some ways qualitative in nature rather than quantitative.  So it's not about saying our costs are "X" dollars and they are really "Y" dollars.  It's the relevant representations are about low, flexible, highly scaleable and high leverageable costs.  And I think the implication of the defendants' argument

would be that qualitative statements are somehow categorically immaterial puffery. And that's just not the case.

And the *City of Monroe* case out of the Sixth Circuit that we cite in our brief has a long section or a significant quote from, actually, the *Virginia Bank Shares* case from the Supreme Court from 1991. And that case really struck me as I was looking back over my materials. In that case, which related to a merger, the question, the representation at issue was the company's statement that they had gotten "a high value" for their company, so a good price, in other words. And the defendants in that case said, well, high value, that's, you know, that's not a specific number of dollars, how could that be considered false or misleading. And the Supreme Court rejected that argument and said that in that kind of a context, in a commercial context, it would be understood that the statement that the company got high value for its shares would be based on facts, and that it was a significant statement to the market in the context of that case and, therefore, was actionable.

And I would submit, your Honor, that the, the relevant representation in that case about high value is rather similar to Home Point's statement about their purported low costs and flexible cost structure. There are a number of other examples I can point your Honor to, for example, the *General Electric* case out of the Southern District of New York, where they said

the quality of our, of our subprime mortgage exposure, we have high quality subprime mortgages.  Of course, we know how that all turned out, they did not.  And you know, it wasn't a misrepresentation about we have 20 mortgages but they really had 19, or it wasn't a misrepresentation along those lines.  It was qualitative in nature that was not considered to be inactionable puffery in the context of that case.

I would also note to your Honor that we cite cases in our brief where, where statements about low costs, about purported low costs are considered to be material.  That would be the *UICI* and the *QuantumScape* cases that we cite, so quite similar to our situation.  And, for example, in *QuantumScape*, the company said their expected approach to technology should lower costs.  It turns out there wasn't a basis for that.

I would also note, and sorry to go back for one moment on the forward-looking statements point, that there are many statements the defendants don't even attempt in their brief to argue are forward-looking.  They point to some examples.  We disagree with those examples, but it doesn't cover all of the statements that we cite.  So we certainly can't be expected to guess which other statements, which we don't believe are forward-looking, the defendants might consider forward-looking and why.  So that's, that's an issue, frankly, with the way they present their argument, which is not even rectified in the reply.

I believe that's it for puffery.  I'm happy to turn very briefly to loss causation.

So there is no dispute between parties, I don't believe, that loss causation is not an element that we are required to plead in a Section 11 case.  That's different from a 10(b) case.  We're not required to plead it or show it in our papers.  Rather, a case, Section 11 case should only be dismissed on loss causation grounds if somehow we've pled ourselves out of court and it's simply impossible on the face of the complaint for loss causation to exist.  And that certainly doesn't exist here, your Honor, in a situation where the corrected disclosures are made, the stock goes down that very day and analysts attribute the decline to that very -- to those very disclosures.  And this would be in paragraph 72 of our complaint, we cite, and 66 of our complaint, we cite to analysts being focused on these questions of, you know, what are, what are the costs of the company.  They were surprised by both the increase in costs and by the fact that interest rates had had such a significant effect on its margins, and certainly didn't know what Mr. Elbaum said, that the company expected it the whole time.  For all of those reasons, those facts both point to materiality as well as loss causation.

Mr. Waldman references a statement from March of 2021 with respect to the amount of fixed and variable costs.  As he notes, this issue at most only goes to loss causation because

it's not part of the offering documents.  So it could, in theory, implicate whether there was an intervening cause of the decline but in fact it doesn't, doesn't do so because on, on the very same page of that earnings call, the CEO came in on top of what the CFO had said and, in fact, and said we have all these wonderful efficiencies and our costs are declining.  And so, in fact, that earnings call continued the misleading message that had come from the offering documents that Home Point had this low-cost structure.

On top of that, your Honor, I would note that a breakdown of fixed and variable costs actually isn't what we're talking about with our case.  All that variable costs mean are essentially the marginal cost of production, a cost associated with producing loans themselves, whereas fixed costs would be things like employee salaries and technology costs and things like that.  Either fixed or variable costs, frankly, could go up or down in good or bad times for the business in theory.  So the flexibility that, and the lack of flexibility that our case is about on the cost side is not directly related to how many costs were fixed versus variable.

And then lastly, your Honor, I would note simply on the Section 15 control personal liability, because Section 11 liability attaches, the defendants don't dispute that if Section 11 liability attaches, then Section 15 control person liability attaches as well.

THE COURT:  Thank you.

MR. ZWEIG:  Thank you, your Honor.

MR. WALDMAN:  Your Honor, just a few brief points, if you'll allow?

THE COURT:  Mh-hm.

MR. WALDMAN:  I promise to be brief.

Your Honor, just four things I noted in the argument. First, as I started with, my, my view is this claim rests on the idea that Home Point saw, to use counsel's word, a storm on the horizon.  That storm on the horizon was the Fed, the Federal Reserve raising interest rates.  There is no allegation about how the company could have had knowledge about what the Federal Reserve would do in the first quarter of 2021.  That was different than what the Federal Reserve itself had said. And there is no way, quite frankly, your Honor, the Federal Reserve could have anticipated what it was going to do with those interest rates given the uncertainty in the economy.  But the suggestion that Home Point saw a storm on the horizon that the Federal Reserve hadn't announced or didn't know itself just doesn't, just doesn't hold in this pleading.

Counsel then says that because Home Point had this special knowledge of the storm on the horizon, the forward-looking statements about its costs structure must also be wrong.  That, that is not proper Section 11 pleading.

Second, your Honor, with respect to statements made by

Mr. Elbaum on May 6th, I think that's just a misreading of what Mr. Elbaum says.  And it does, it certainly does not say that Home Point expected interest rates to go up.  Mr. Elbaum is talking in that earnings call about the well known and well understood relationship between rising rates and rising pull-through, which means when rates go up, more people who have offers for home loans take them at the low offers because they are good rates, as the rates are going up.  That's what he is saying that that, that pull-through rate is expected to go up if rates go up.  That's all he is addressing.  But that's something that happened during the first quarter and not prior to the IPO.

Third, your Honor, counsel cited the *Helwig* case to your Honor about specific legislation as opposed to what the Federal Reserve would do.  The *Helwig* case, the court held that the statements about the specific legislative measures were "framed as material reassurances."  Here, Home Point wasn't given material reassurances.  It didn't know what the Federal Reserve would do with rates.  And I submit to your Honor, nobody knew what the Federal Reserve would do with rates at that point.

And last but not least, your Honor, counsel suggests that Home Point waived some argument.  We respond to that waiver argument in Footnote 1 in our reply brief.  It's our view that the plaintiff has changed the emphasis in its quotes,

what it chooses to bold and italicize as a way of suggesting that we've argued the wrong thing. We cite to you law, your Honor, from the Northern -- from the Central District of California that when a plaintiff switches the way they bold, that isn't, that isn't the defendant's fault in filing a motion to dismiss. Here, we're attacking which portions of the statements they themselves are citing as false. And so I don't believe there's been any waiver with respect to that argument. But our full case cites and rationale for that is in Footnote 1 of the reply.

Thank you, your Honor.

THE COURT: Thank you very much. I'm going to issue an opinion.

MR. WALDMAN: Thank you very much, your Honor.

THE COURT: All right. Thank you.

MR. ZWEIG: Thank you, your Honor.

THE COURT: Anything else you want to talk about today? Do you just want to wait for the opinion?

MR. WALDMAN: No, your Honor.

THE COURT: All right. Thank you.

THE CLERK: All rise. Court is adjourned.

(Proceedings concluded, 10:45 a.m.)

CERTIFICATE OF COURT REPORTER


        I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


_____s/Christin E. Russell__                August 11, 2022
CHRISTIN E. RUSSELL                          Date
FCRR, RDR, CRR, CSR-5607
Federal Official Court Reporter