UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN RE HOME POINT CAPITAL INC. SECURITIES LITIGATION | Case No. 21-11457<br>Honorable Shalina D. Kumar<br>Magistrate Judge Kimberly G. Altman |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS (ECF NO. 26)**

## I. INTRODUCTION

Plaintiffs filed this action against defendants Home Point Capital, a residential mortgage originator and servicer, certain individual Home Point officers and directors, and private equity funds which owned the majority of Home Point common stock and voting power. ECF No. 23, PageID.219-229. Plaintiffs, a class of investors who purchased Home Point common stock in or traceable to Home Point's initial public offering (IPO), allege that defendants violated federal securities laws and owe them remedies under Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. § § 77k and 77o. *Id.* at PageID.224. Defendants move for dismissal of plaintiff investors' claims under Federal Rule of Civil Procedure 12(b)(6). ECF No. 26. The

motion was fully briefed and the Court heard oral argument on August 11, 2022. ECF Nos. 27, 33, 34, 38.

## II. FACTUAL BACKGROUND

According to plaintiff investors' complaint, Home Point operates as a residential mortgage originator and servicer. ECF No. 23, PageID.229, ¶ 35. In its origination operations, Home Point sources loans through wholesale, correspondent, and direct channels. *Id*. For wholesale originations, Home Point makes mortgage loans to borrowers who have relationships with independent brokers; for the correspondent segment, Home Point purchases loans from original lenders; and in the direct channel, Home Point loans directly to borrowers. *Id.*

The wholesale segment of Home Point's mortgage loan originations is the most significant part and the primary focus of Home Point's business. *Id*. at PageID.230, ¶ 37. After Home Point underwrites and funds a loan to a borrower, it sells the loan to investors like Fannie Mae and Freddie Mac. *Id*. at ¶ 38. Its revenues primarily consist of the difference between the cost of originating the loans in the wholesale segment and the price at which it ultimately sells those loans to investors. *Id*. at ¶ 39. This differential is known as gain-on-sale margin. *Id.*

From 2018 to 2020, Home Point aggressively expanded its network of broker partners for its wholesale operations, becoming the third largest wholesale lender in the United States by September 30, 2020. *Id*. at PageID.231, ¶ 41. Like many mortgage lenders, Home Point experienced strong profitability in 2020 due to the high volume of mortgage refinancing driven by low interest rates. *Id*. at ¶ 42. Home Point seized on these market conditions and conducted an IPO in January 2021. *Id*. at ¶ 43. Home Point issued 7.25 million shares of its common stock to the public at the offering price of $13.00 per share. *Id*. at PageID.232, ¶ 45.

In connection with its IPO, Home Point filed its Registration Statement with the Securities Exchange Commission (SEC), effective on January 28, 2021. *Id*. at ¶ 44. On February 1, 2021, Home Point filed the Prospectus with the SEC in connection with the IPO. The Prospectus combined with the Registration Statement comprises the Offering Documents. *Id*. at ¶ 46.

Plaintiff investors allege that the Offering Documents contained untrue statements of material fact, omitted material facts that made statements contained in the Offering Documents misleading, and failed to make adequate disclosures required by the rules and regulations governing

IPOs. *Id*. at ¶ 47. Plaintiff investors identify two types of material representations or omissions in the Offering Documents. First, plaintiff investors point to many statements noting that Home Point's business model operated on lower fixed costs than its competition, that its scalable low-cost structure allowed it to increase loan volume with minimal increases in expenses and without requiring a high level of fixed overhead:

- We were built to take advantage of the massive opportunity in the mortgage market over time through a ***dedication to a highly scalable low-cost structure . . . which is capable of handling substantial increases in loan origination volume with minimal increases in expenses***. We believe that our advantages will help us face substantial competition in this market. We expect that our ***commitment to efficient operations*** [and other factors] will allow us to ***compete successfully across market cycles. This has translated to our ability to achieve robust growth***.

- We are strategically focused on [the wholesale] channel given that the underlying cost structure is more efficient than that of Distributed retail . . . As a result, ***we are able to operate with a lower fixed cost than many of our competitors. This highly leverageable cost structure allows for improved financial flexibility in varying interest rate environments.***

- We benefit from . . . ***our distinct wholesale strategy***, which . . . enable[s] . . . ***favorable unit economics, driven by lower fixed costs***.

- We have been able to achieve a ***competitive advantage in our sales cost structure*** through scale[.]

- ***[O]ur flexible cost structure***, has positioned us to further consolidate volume from the smaller and less efficient wholesale lenders[.]

- Our partner relationships and operating platform are intended to be reliable and scalable and to provide us ***flexibility to respond to different market environments. We believe that this provides us with significant operating leverage during market expansions without requiring a high level of fixed overhead***.

- We believe our foundation of process engineering expertise and a componentized technology architecture has resulted in a ***competitive cost structure with significant upside opportunity*** . . . We expect that the combination of superior process engineering and componentized technology will create a ***best-in-class cost structure*** and experience for our partners and customers.

- As we continue to grow, we believe ***the scalability of our partner-driven business model*** will produce significant operating leverage and increased profitability.

- The rate of growth in our Wholesale channel also demonstrates its scalability. We believe that our . . . ***highly leverageable cost structure allow[s] us to quickly flex origination capacity through different origination environments, while maximizing profitability***.

- ***[O]perational efficiencies are sustainable competitive advantages*** for our business.

ECF No. 27, PageID.1597-98 (emphasis supplied by plaintiff investors) (citing ECF No. 23, PageID.233-34, ¶ 50). Plaintiff investors contend that these representations were false because, in fact, Home Point locked into higher fixed costs and overhead with expansion and that these costs continued to escalate even as the mortgage market constricted and deteriorated. ECF No. 23, PageID.233, ¶ 49.

Second, plaintiff investors assert that Home Point's statements that rising interest rates could decrease demand for its mortgage products and its ability to realize gains from disposition of assets was misleading because it actually knew that rising interest rates would shrink its margins and that it expected interest rates to rise. They cite these statements from the Offering Documents:

- The gain recognized from sales in the secondary market represents a significant portion of our revenues and net earnings . . . The prices we receive for our loans vary from time to time and ***may*** be materially adversely affected by several factors, including . . . the level and volatility of interest rates[.]

- Interest rate fluctuations ***could*** significantly decrease our results of operations and cash flows and the fair value of our assets . . . Changes in the level of interest rates also ***may*** affect our ability to realize gains from the disposition of assets.

- A downturn in economic conditions resulting in adverse changes in interest rates . . . ***could*** decrease demand for our mortgage loan

> products as a result of a lower volume of housing purchases and reduced refinancing of mortgages and ***could*** lead to higher mortgage defaults and lower prices for our loans upon sale.

ECF No. 27, PageID.1598-99 (emphasis supplied by plaintiff investors) (citing ECF No. 23, PageID.244, ¶ 53).

Plaintiff investors allege that, in a May 6, 2021 earnings call and press release, Home Point revealed that its wholesale gain-on-sale margins had collapsed, in part due to escalating, locked-in costs, and in part due to an excess of mortgage lending supply over demand caused by rising interest rates. ECF No. 23, PageID.242-48, ¶ ¶ 62-73. They contend that the information divulged on May 6th amounted to a corrective disclosure of material misrepresentations in Home Point's Offering Documents. *Id*. Based on these corrective disclosures, plaintiff investors assert that Home Point's share price dropped 17.7%, to $7.72 per share on May 6, 2021 and continued to drop for several days as analysts reported on the earnings news, closing at $6.07 per share on May 10, 2021. *Id*. at PageID.248, ¶ 74. Plaintiff investors' action seeks damages for their significant losses as a result of defendants' alleged wrongful acts and omissions. *Id*., at ¶ 76.

## III. ANALYSIS

Defendants move for dismissal of plaintiff investors' claims under Federal Rule of Civil Procedure 12(b)(6). They argue that plaintiff investors fail to state a claim upon relief may be granted because the statements about low fixed costs amount to unactionable puffery and that Home Point had no reason or means to anticipate the rise of interest rates because, at the time of the IPO, the Federal Reserve had indicated rates would remain unchanged until at least 2023. They also argue that the statements related to costs and to rising interest rates are not actionable because, as forward-looking statements, they were protected by the safe harbor provision of the Private Securities Litigation Reform Act, 15 U.S.C. § 77zz. Defendants also contend that the investors' claims must be dismissed because the decline in share value was not related to any material misstatement or omission in the Offering Documents. ECF No. 26.

### A.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on

its face." *Golf Village N., LLC v. City of Powell, Ohio*, 14 F.4th 611, 617 (6th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Courts construe the complaint in the light most favorable to the plaintiffs and draw all reasonable inferences in their favor. *Golf Village*, 14 F.4th at 617 (citing *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 897 (6th Cir. 2019)). When a complaint does adequately state a claim, it may not be dismissed based on the court's "assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Twombly*, 550 U.S. at 563, n.8.

**B.**

Section 11(a) of the Securities Act of 1933 gives a buyer of securities a right of action against an issuer or designated individuals for an untrue statement of material fact or omission of a material fact in a registration statement for a public offering. 15 U.S.C. § 77k(a); *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015).

Omissions are considered material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988) (citation omitted). A duty to disclose arises only when the issuer knew—or should have known—of the omitted fact at the time the statements were made. *See In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 300 (S.D.N.Y. 2021). Clairvoyance is not required. *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

Home Point had no obligation to disclose information about interest rate hikes that were unknown and unanticipated by even the Federal Reserve at the time of the IPO. Nor was Home Point obligated to provide stronger warnings about the impact rising interest rates would have on its performance; rising interest rates pose an obvious risk to mortgage lenders, which investors could be expected to understand. *See In re Omnicare, Inc. Securities Litigation*, 769 F.3d 455, 471-472 (6th Cir. 2014) (materiality requirement is not designed to attribute child-like simplicity to investors). Thus, the investors' allegations relative to the statements surrounding interest rates and the impact they could have on Home Point's

margins and profitability are not actionable material misrepresentations. Dismissal of these claims is warranted.

Puffery, or vague, soft comments upon which a reasonable investor would not rely, are not material for the purposes of a securities fraud claim. *Omnicare*, 769 F.3d at 472. General representations regarding quality, or being best, top, or leader in the industry have been deemed as loosely optimistic, rosy affirmations, "too squishy, too untethered to anything measurable, to communicate anything a reasonable person would deem important to a securities investment decision." *City of Monroe Empl's Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005); *see also In re Ford Motor Co. Securities Litigation*, 381 F.3d 563, 570-571 (6th Cir. 2004); *In re TransDisgm Grp. Inc. Securities Litigation*, 440 F. Supp. 3d 740, 764 (N.D. Ohio 2020).

Courts are to tread lightly in assessing the materiality of misrepresented or omitted facts at the motion-to-dismiss stage of a securities fraud case. *Omnicare*, 769 F.3d at 472. Materiality is a question of fact which should typically not be decided on a motion to dismiss. *Id*.

> However, the Sixth Circuit has made clear that even superficially broad statements of corporate self-praise must be evaluated in context to determine if they convey more than just a generalized optimism. The key is whether the proposition at issue can be

> proven or disproven using standard tools of evidence. Thus, vague statements not subject to verification by proof are generally deemed non-actionable puffery. But opinion or puffery in particular contexts when it is both factual and material may be actionable.

*St. Clair County Employees' Ret. System v. Acadia Healthcare Co., Inc.*, 2021 WL 195370, at *6 (M.D. Tenn. Jan. 20, 2021) (quoting *Bridgestone*, 399 F.3d at 674)) (internal marks omitted) (statements regarding staffing levels and the quality of care at healthcare facilities are both capable of objective measurement and verification using standard tools of evidence, and thus not puffery).

Some of the Offering Documents' statements cited by plaintiff investors as misrepresentations clearly fall within the definition of non-actionable puffery. For example, the statements "our commitment to efficient operations . . . will allow us to compete successfully . . ." and "operational efficiencies are sustainable competitive advantages for our business" are both the type of self-praising, optimistic affirmations that courts routinely find too nebulous to meet the materiality threshold. ECF No. 26-4. PageID.1266-67. But other mixed factual statements, subject to both measurement and verification, communicate information that a reasonable person could deem important to a securities investment

decision: “we are able to operate with a lower fixed cost than many of our competitors . . . [which] allows for improved financial flexibility in varying interest rate environments” and “we believe that [our scalable operating platform] provides us with significant operating leverage during market expansions without requiring a high level of fixed overhead.” *Id.* at PageID.1252, 1266. Viewing these statements about limited fixed costs in the light most favorable to plaintiffs, a reasonable juror could conclude that they were material misrepresentations. They thus cannot be deemed unactionable puffery and dismissal under Rule 12(b)(6) on these grounds is not appropriate.

**C.**

Defendants also argue that plaintiff investors’ misrepresentation claims relating to cost structure should be dismissed under the Private Securities Litigation Reform Act (PSLRA), which protects certain “forward-looking statements” that are accompanied by “meaningful cautionary statements.” 15 U.S.C. § 77z-2(c)(1)(A). Plaintiff investors counter that the PSLRA safe harbor provision does not apply to forward-looking statements issued in connection with an IPO. 15 U.S.C. § 77z-2(b)(2)(D). Replying to this argument, defendants switch gears to assert safe harbor protection

under the bespeaks-caution doctrine, a common-law counterpart to the PSLRA's statutory safe harbor. ECF No. 33.

Arguments raised for the first time in reply briefs are generally deemed waived. *Scottsdale Ins. Co. v. Flowers,* 513 F.3d 546, 553 (6th Cir. 2008). Because the non-moving party has no right to respond to the reply brief, courts treat such arguments as waived as a matter of litigation fairness and procedure. *Id*. But even if defendants' bespeaks-caution-doctrine argument was not waived, a safe harbor provision for forward-looking statements does not apply because many of the statements in controversy are not forward-looking. For example, "we *are* able to operate with a lower fixed cost . . .;" "[w]e *benefit* from . . . our distinct wholesale strategy, which . . . *enable[s*]… favorable unit economics, driven by lower fixed costs;" and "our flexible cost structure, *has positioned* us to further consolidate volume from the smaller and less efficient wholesale lenders . . ." are all representations relating to the present or past, not the future. ECF No. 26-4, PageID.1252, 1266-67 (emphasis added). Consequently, plaintiff investors' claims are not subject to either the statutory or common-law safe harbor for forward-looking statements. Dismissal on these grounds is not available.

**D.**

Finally, defendants argue that plaintiff investors' claims should be dismissed because they cannot establish that their loss was caused by Home Point's May 2021 corrective disclosures. Loss causation is not an element of a Section 11 claim, but rather an affirmative defense defendants must prove. *Indiana State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc.,* 583 F.3d 935, 947 (6th Cir. 2009). The only way for defendants to succeed on this affirmative defense at the motion-to-dismiss stage is if the complaint on its face demonstrates that loss causation is impossible. *In re Regions Morgan Keegan Securities Litigation*, 2010 WL 5464792, at *5 (W.D. Tenn. Dec. 30, 2010). The amended complaint does not eliminate the possibility of loss causation for plaintiff investors; that Home Point's stock price declined before the corrective disclosure does not preclude the possibility that the price decline after the May 2021 disclosure stemmed from that disclosure. Defendants may assert lack of loss causation at summary judgment or trial, but it is not ripe for determination now.

**E.**

Because plaintiff investors' primary liability claims under Section 11 survive defendants' motion, so do their Section 15 claims for control person liability against individual defendants other than Mr. Morse and Ms. Goodman, against whom plaintiff investors have withdrawn their Section 15 claims.[1] *See J&R Mktg., SEP v. General Motors Corp.*, 549 F.3d 384, 389-90 (6th Cir. 2008).

## IV. CONCLUSION

For these reasons, the Court **GRANTS IN PART** and **DENIES IN PART** defendants' motion to dismiss (ECF No. 26). Plaintiff investors' claims stemming from representations related to interest rates and the impact they would have on Home Point's margins and profitability are **DISMISSED**. Plaintiff investors' claims regarding alleged misrepresentations about Home Point's limited fixed costs survive defendants' motion to dismiss and may proceed to discovery.

s/Shalina D. Kumar
SHALINA D. KUMAR
United States District Judge

Dated: October 5, 2022

[1] Plaintiff investors maintain Section 11 claims against Goodman and Morse as director nominees. ECF No. 27.